# In the United States Court of Federal Claims

**No. 10-170C**
**Filed: February 27, 2015**
**Reissued for Publication: May 27, 2015[1]**

```
* * * * * * * * * * * * * *   *
KEVIN M. STEIN,                *
                               *   Military Pay Act, 37 U.S.C. § 204; Lack
              Plaintiff,       *   of Subject Matter Jurisdiction; Motion
      v.                       *   to Dismiss; Motion for Judgment
                               *   on the Administrative Record; 10
UNITED STATES,                 *   U.S.C. § 1201; 10 U.S.C. § 1214.
                               *
              Defendant.       *
                               *
* * * * * * * * * * * * *  *   *
```

       **Jason E. Perry**, Law Office of Jason Perry, Wellington, FL, for plaintiff.

       **Richard P. Schroeder**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him were **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, , Civil Division, Washington, D.C.  **Major Sean D. Schrock**, Office of the Judge Advocate General of the Navy, of counsel.

**O P I N I O N**

<u>HORN, J.</u>

**FINDINGS OF FACT**

       Plaintiff Kevin M. Stein filed a complaint in the United States Court of Federal Claims, "for wrongful discharge from the US Navy and denial of retired retainer pay, or in the alternative, an action to recover military disability retirement pay and benefits." Plaintiff initially enlisted in the United States Navy on November 21, 1988, serving until 1994. Plaintiff states, "[a]fter a brief break in service," plaintiff subsequently re-enlisted in the Navy in 1995. Mr. Stein's most recent enlistment was to run from October 15, 1998 to April 14, 2004, originally as a five-year term, with a subsequent six-month extension. During his service with the Navy, plaintiff worked in the field of electronics, eventually

---

[1] This opinion was issued under seal on February 27, 2015. The parties were given the opportunity to propose possible redactions.  Although the parties proposed redactions to the opinion, the court believes none of the redactions proposed were warranted, and, therefore, the original opinion is hereby unsealed and reissued without redaction.

rising to the grade of Electronics Technician First Class (E-6). Plaintiff was discharged from the Navy on March 19, 2004.

In 2000,[2] plaintiff sought medical treatment from military medical providers for involuntary jerking movements, tics, and numbness, and was diagnosed with a motor function disease (Stiff-Man Syndrome),[3] Obstructive Sleep Apnea[4] (OSA), and Gastroesophageal Reflux Disease[5] (GERD). Because of his conditions, on May 4, 2000, plaintiff was placed on limited duty status. Initially, the end of plaintiff's obligated service (EAOS) was October 14, 2003, however, that date was later extended for a period of six months, establishing his new end of obligated service, or EAOS, of April 14, 2004.[6]

On September 21, 2000, the Navy convened a Medical Evaluation Board (MEB), which found plaintiff suffered from bilateral upper extremity neuropathy,[7] classified in the International Classification of Diseases (ICD) as ICD number 354.9. The MEB recommended that plaintiff again be placed on limited duty status, until May 21, 2001, anticipating that upon its completion "he [would] be fit to return to full duty."  On March 15, 2001, plaintiff again was evaluated by a MEB, and diagnosed with bilateral upper

---

[2] There is little documentation in the record about any medical conditions plaintiff may have had before 2000.

[3] Stiff-Man Syndrome is defined as a "condition of unknown etiology characterized by progressive fluctuating rigidity of axial and limb muscles in the absence of signs of cerebral and spinal cord disease but with continuous electromyographic activity." Dorland's Illustrated Medical Dictionary 1849 (32nd ed. 2012).

[4] Obstructive Sleep Apnea is defined as a "sleep apnea resulting from collapse or obstruction of the airway with the inhibition of muscle tone that occurs during REM [Rapid Eye Movement] sleep." Dorland's Illustrated Medical Dictionary 117 (32nd ed. 2012). Sleep Apnea is defined as "transient periods of cessation of breathing during sleep." Id.

[5] Gastroesophageal Reflux is defined as a "reflux of the stomach and duodenal contents into the esophagus, which sometimes occurs normally, particularly in the distended stomach postprandially, or as a chronic pathological condition that leads to the conditions known as gastroesophageal reflux disease." Dorland's Illustrated Medical Dictionary 1616 (32nd ed. 2012).

[6] Although it is not clear why plaintiff's obligated service was extended, in its December 20, 2010 decision, the Board for Correction of Naval Records (BCNR), stated that "[p]resumably, the extension was granted in order for you to undergo disability evaluation prior to your EAOS."

[7] Neuropathy is defined as "a functional disturbance or pathological change in the peripheral nervous system." Dorland's Illustrated Medical Dictionary 1268 (32nd ed. 2012).

extremity peripheral neuropathies, ICD number 3569, and diffuse myopathies[8] of unclear etiology, ICD number 3599.  The MEB stated that "the member's condition interferes with the reasonable performance of his assigned duties," and referred plaintiff's case to a Physical Evaluation Board (PEB) for a fitness for duty determination.  The MEB indicated that until a PEB reached a final decision in plaintiff's case, he "is not to be deployed aboard ship or sent to any area remote from Naval Medical Center, Portsmouth, Virginia."

The April 17, 2001 MEB's referral to a PEB, included diagnoses of "bilateral upper extremity peripheral neuropathies," ICD number 3569, "diffuse myopathies of unclear etiology," ICD number 3599, "proximal myopathy, type unknown," ICD number 3599, and "right carpal tunnel syndrome," ICD number 3540. Plaintiff's first informal PEB convened on August 7, 2001, and found plaintiff fit to continue on active duty.  Plaintiff accepted the PEB's finding of fit for duty on August 27, 2001.

After plaintiff's September 20, 2001 operational screening,[9] plaintiff's commanding officer at the Naval Computer and Telecommunications Area Master Station Atlantic (NCTAMS LANT) advised the Commander, Navy Personnel Command (COMNAVPERSCOM), that plaintiff was found "unsuitable for transfer to sea or overseas duty" and "not world wide assignable" because of his "ongoing, chronic medical conditions. ICD-9 codes 356.9; 359.9; 354.0; 780.57; 530.82." Because plaintiff stated he wanted to be retained on active duty, and his Officer in Charge concurred, a recommendation was made that plaintiff be retained until the end of his obligated service. Plaintiff, however, was not authorized to extend his current enlistment, or reenlist without prior approval. Plaintiff's commanding officer was directed to have plaintiff sign the

---

[8] Myopathy is defined as "any disease of the muscle." Dorland's Illustrated Medical Dictionary 1224 (32nd ed. 2012).

[9] As provided by the BUMED (United States Navy Bureau of Medicine and Surgery) Instruction 1300.2 (Feb. 17, 2000), Medical, Dental, and Educational Suitability Screening and Exceptional Family Member Program (EFMP) Enrollment, ¶ 1.b, the operational screening procedures are used to:

> (1) Determine of suitability of the Navy and Marine Corps service and family members for overseas, remote duty, or operational assignments by identifying medical, dental, and educational requirements, henceforth referred to as special needs.

> (2) Determine suitability for worldwide operational assignments subsequent to periods of limited duty (LIMDU) or the finding of "fit for continued Naval service" by the Physical Evaluation Board (PEB).

BUMEDINST 1300.2 ¶ 1.b (Feb. 17, 2000).

Administrative Remarks entry,[10] stating "I acknowledge I am not authorized to extend my current enlistment or reenlist without authorization from PERS-832."[11]

Between February 2002 and October 2003, plaintiff[12] underwent several medical evaluations conducted by different military doctors, including three neurologists and a neurosurgeon, because of plaintiff's complaints regarding myoclonic jerks, frequent paresthesias,[13] stiffness, "left lower extremity instability," and problems with his left knee. The doctors ruled out the need for neurosurgical intervention, and noted that plaintiff had sleep apnea and gastroesophageal disease, possible carpal tunnel syndrome, and that he was obese.  Consequently, it was recommended that plaintiff lose weight. Plaintiff's possible Stiff-Man Syndrome received conflicting diagnoses. Although one neurologist indicated a likelihood of a Stiff-Man Syndrome, another neurologist at the Naval Medical Center in Portsmouth, Virginia, observed on October 20, 2003, that there was "no evidence of stiffman syndrome on examination." Dr. Tavee, the neurologist at the Naval Medical Center, did note, however, that plaintiff appeared to have motor tics and primary movement disorder.

On September 12, 2003 and September 17, 2003, Dr. N.M. King at the Naval Medical Center in Portsmouth, Virginia conducted plaintiff's evaluation regarding the possibility of "continuous motor unit activity syndrome," and the possibility of Tourette syndrome.[14] Dr. King diagnosed plaintiff with a continuous motor unit activity syndrome,

---

[10] There is no evidence in the administrative record that plaintiff signed the Administrative Remarks entry to that effect.  Plaintiff, however, did not dispute, either during the course of proceedings before this court, or before the BCNR, that he was not authorized to reenlist without a prior approval of PERS (Navy Personnel Command, Enlisted Separations Branch)-832.

[11] The BCNR, in its December 20, 2010 decision, described that it was plaintiff's COMNAVMILPERSCOM, i.e., Commander, Navy Personnel Command, who had to approve the extension of plaintiff's enlistment or his reenlistment.

[12] A number of the medical records from 2003 noted that plaintiff was 33 years old in 2003.

[13] Paresthesias is defined as "an abnormal touch sensation such as burning, prickling, or formication, often in the absence of an external stimulus." Dorland's Illustrated Medical Dictionary 1383  (32nd ed. 2012).

[14] Gilles de la Tourette syndrome is defined as "a syndrome comprising both multiple motors and one or more vocal tics, occurring over a period of at least one year, at least intermittently but sometimes as frequently as many times daily. Obsessions, compulsions, hyperactivity, distractibility, and impulsivity are often associated."  Dorland's Illustrated Medical Dictionary 1831 (32nd ed. 2012).

Obstructive Sleep Apnea, Gastroesophageal Reflux Disease, hiatal hernia,[15] and ocular myokymia.[16]

On September 17, 2003, the MEB reviewed plaintiff's case and medical records and issued a report, signed by Dr. King, which indicated that plaintiff's complaint of "persistent problem with brief abnormal movements of the limbs" "would be consistent with either the myoclonic jerk or a twitch." The MEB noted that plaintiff had used the drug Klonopin in the past, with marginal results. The MEB referred plaintiff to a PEB for another fitness for duty determination, with a diagnosis of a Stiff-Man Syndrome, ICD number 3339.1, stating that, it was the opinion of the MEB, plaintiff's "condition interfere[d] with the reasonable performance of his assigned duties." Plaintiff signed a "Statement of Patient concerning the Finding of a Medical Board," on November 17, 2003, indicating that he has been "informed of contents, opinion(s) and recommendation(s) of the Medical Board," and he did not "desire to submit a statement in rebuttal." Plaintiff's statement also indicated that plaintiff was not "processing for separation/retirement."

Following the September 17, 2003 MEB report, the MEB issued four separate addenda to its report, expanding the initial diagnosis to include other conditions. In the October 7, 2003 addendum, the MEB noted that plaintiff appeared before the MEB with the diagnosis of obstructive sleep apnea of a moderate degree, which was being treated with "C-PAP [Continuous Positive Airway Pressure] of 14 centimeters of water pressure." The addendum concluded that "[t]his condition and the treatment with CPAP should not interfere with [plaintiff's] abilities to perform his duties on ship or on shore." Furthermore, on October 16, 2003, the MEB issued a second addendum to its September 17, 2003 report, which indicated that plaintiff had gastroesophageal reflux disease manifested by heartburn, ICD number 530.81, and recommended that plaintiff "modify his lifestyle, to avoid foods that are known to aggravate his heartburn" and lose weight. The October 16, 2003 MEB's addendum concluded that plaintiff was "fit for duty from a GI [gastrointestinal] standpoint." The third addendum, issued on January 22, 2004, stated that plaintiff's final diagnosis was motor tics, ICD number 333.3, and that he was scheduled to be seen by Dr. Cannard, at the Walter Reed Army Medical Center, for a second opinion. On February 11, 2004, the MEB issued a fourth addendum to its September 17, 2003 report, indicating that plaintiff was evaluated by Dr. Cannard at Walter Reed Medical Center, for a suspected movement disorder, and diagnosed with motor tics. The February 11, 2004 MEB's addendum also indicated that plaintiff's current medication, Klonopin, was providing only partial control of his symptoms, and concluded: "Further evaluation and treatment by a movement disorder specialty clinic would be best for this patient." Plaintiff

---

[15] Hiatal hernia is defined as "herniation of an abdominal organ, usually the stomach, through the esophageal hiatus of the diaphragm" and a hernia is defined as "the protrusion of a loop or knuckle of an organ or tissue through an abnormal opening." Dorland's Illustrated Medical Dictionary 848, 850 (32nd ed. 2012).

[16] Myokymia is defined as "a benign condition marked by brief spontaneous tetanic contractions of motor units or groups of muscle fibers, usually adjacent groups of fibers contracting alternately." Dorland's Illustrated Medical Dictionary 1223 (32nd ed. 2012).

signed a statement acknowledging the content of each addendum, and indicated he did not "desire to submit a statement of rebuttal" to any of the four addenda.

On October 8, 2003, the Officer in Charge, Naval Computer and Telecommunications Area Master Station Atlantic Detachment Hampton Roads, Anthony Bruner, sent a memorandum to the Commanding Officer, Naval Medical Center in Portsmouth, Virginia, titled "Non-Medical Assessment ICO ET1 Kevin M. Stein." The memorandum stated that due to plaintiff's

> diagnosed medical conditions, several significant limitations have been placed on the type and extent of electronics work he [could] accomplish. Involuntary muscle movement, numbness and occasional fatigue prohibit him from working on high voltage and energized equipment. However, his experience affords him many opportunities to provide technical and professional guidance to others. Realizing Electronics Technicians at sea are required to work on high voltage equipment and aloft, ET1 Stein is not recommended for sea duty. Due to his expertise he is highly recommended to be retained in the Navy on shore duty in supervisory positions.

On November 12, 2003, the MEB referred plaintiff's case to a PEB for evaluation, with the following diagnoses: Stiff-Man Syndrome, ICD number 3339.1, Gastroesophageal Reflux Disease manifested by heartburn, ICD number 530.81, and Obstructive Sleep Apnea of a moderate degree with a C-PAP of 14 centimeter of water, ICD number 780.57. On January 13, 2004, the informal PEB found plaintiff "Fit to Continue on Active Duty."

Plaintiff subsequently underwent a suitability screening on January 20, 2004. The report issued by the Branch Medical Clinic in Norfolk, Virginia, indicated that plaintiff had "[n]eurologic conditions" and was treated with "recurrent or frequent medications," although the suitability screening questionnaire was left incomplete and unsigned by Chief Hospital Corpsman Jeffrey A. Hansen. Specifically, the boxes indicating whether plaintiff was unsuitable for overseas, remote duty or operational assignment were not checked. On January 26, 2004, the determination made by Chief Hospital Corpsman Hansen in the suitability screening questionnaire was endorsed by Michael J. Pelzel, Chief Hospital Corpsman (Surface Warfare Qualified) at Branch Medical Clinic, Sewell's Point, Sea/Overseas Screening office. In Chief Hospital Corpsman Pelzel's memorandum to the Command Transfer Coordinator, he found plaintiff unsuitable for "sea/sub/overseas" duty because of the Stiff-Man's Syndrome, ICD number 333.91, Gastroesophageal Reflux Disease manifested by heartburn, ICD number 530.81, and Obstructive Sleep Apnea of a moderate degree, ICD number 780.57. The memorandum noted that plaintiff had been found fit for continued service by a PEB, "however, [he] still suffers from above conditions." The memorandum also included a recommendation for plaintiff to be assigned shore duty in the continental United States (INCONUS), and stated that he might "qualify for shore based overseas duty near major MTF [medical treatment facility]," which would, however, require approval of command. The memorandum

concluded that "in the case of recommendations for administrative separation," plaintiff's determination as "unsuitable" applied.

On January 27, 2004, plaintiff's Officer in Charge, Naval Computer and Telecommunications Area Master Station Atlantic notified the Bureau of Naval Personnel about plaintiff's unsuitability for operational duty, determined during the January 20, 2004 operational screening.  The Officer in Charge indicated that although the PEB found plaintiff fit to continue on active duty, due to plaintiff's "ongoing medical conditions," which were identified by ICD codes: 333.91 (Stiff-Man Syndrome), 530.81 (Gastroesophageal Reflux Disease manifested by heartburn) and 780.57 (Obstructive Sleep Apnea of a moderate degree), he was unsuitable for sea duty and recommended INCONUS/OUTCONUS [Inside the Continental United States/Outside the Continental United States] shore duty. Despite plaintiff's wish to be retained on active duty, his commanding officer recommended that plaintiff be separated at the expiration of the end of his obligated service on April 14, 2004, "due to member's chronic medical conditions, spouse's EFM [Exceptional Family Member] CAT [Category] 4 and daughter's EFM CAT 2."[17]

On January 30, 2004, plaintiff requested reconsideration of the findings of the November 12, 2003 MEB and the January 13, 2004 PEB. Plaintiff stated that his condition warranted a finding of unfit with thirty percent disability rating.  Specifically, Mr. Stein stated:

1. I disagree with the findings of fit in my PEB dated January 13, 2004, and the medical diagnosis of Stiff Man Syndrome in the Medical Evaluation Board dated September 17, 2003 by Dr. N.M. King, LCDR/MC(FS)/USNR/00801.

2. In enclosure (1), neurologist Dr. Tavee, LT/MC/USN has diagnosed me with MOTOR TICS (ICD-9 #333.3).  In enclosure (2) LT Tavee initially expresses her disagreement with the findings of Stiff-Man Syndrome.  In enclosure (3), LT Tavee notes a consideration for a movement disorder consult with the National Institute [sic] of Health/Bethesda Naval Hospital for a second opinion.

3. In enclosure (1) & (4) LT Tavee has been able to acquire a consult to obtain a second opinion with Dr. Kevin R. Cannard, LTC/MC/USA at Walter Reed Army Medical Center on February 5, 2004.  LT Colonel Kevin R. Cannard is a highly regarded movement disorder specialist.

---

[17] The Bureau of Naval Personnel informed plaintiff's Officer in Charge on January 31, 2004, that plaintiff was to be administratively separated pursuant to Military Personnel Manual (MILPERSMAN) 1910-120, Separation by Reason of Convenience of the Government – Physical or Mental Conditions, due to plaintiff's "ongoing chronic medical conditions.  ICD codes: 333.91 [Stiff-Man Syndrome]; 530.81 [Gastroesophageal Reflux Disease manifested by heartburn]; 780.57 [Obstructive Sleep Apnea of a moderate degree]."

> 4. I respectfully request the Physical Evaluation Board to suspend the present findings and reconsider the findings once a diagnosis is obtained from Dr. Cannard, LTC/MC/USA.

Plaintiff continued: "If the PEB reconsiders my case and there is no change in findings, then I request a formal hearing."

On February 5, 2004, plaintiff underwent another medical evaluation. Dr. Kevin Cannard at Walter Reed Army Medical Center ruled out plaintiff's stiff-man's syndrome, and concluded that Mr. Stein appeared to have late onset tic disorder. Dr. Cannard observed that the tic disorder was atypical in its late onset, lack of supressibility, and stimulus sensitive features, which was suggestive of a somatoform[18] origin. Dr. Cannard's February 5, 2004 assessment also included, in part, the following findings:

> 2. Possible syndrome of continuous motor activity such as benign fasciulations [sic] - cramp variant
> 3. Right Carpal Tunnel Syndrome
> 4. Obstructive Sleep Apnea polysomnogram confirmed
> 5. Periodic Limb Movements of Sleep per polysomnogram
> 6. H/o [history of] Low Back Pain

In light of Dr. Cannard's February 5, 2004 report, on February 18, 2004, the informal PEB reconsidered its initial finding of fit, but decided that there was no change to its initial findings. The presiding informal PEB member, United States Marine Corps Colonel M.L. Culver, noted that Dr. Cannard's report determined that plaintiff does not have Stiff-Man Syndrome, but that he had sleep apnea and "tics," for which the recommended treatment was psychiatric intervention and Botox injections. The PEB concluded:

> Other than the tic problem – suspected to be somatic – he is not disabled – + the tic isn't even disabling.

> FIT.  No change.  <u>No</u> formal board necessary.

(capitalization and emphasis in original).

On February 19, 2004, in a final decision, the Director of Naval Council of Personnel Boards "disapproved" plaintiff's request for a formal PEB hearing. Consequently, the February 20, 2004 memorandum, titled "Reconsideration of Preliminary Physical Evaluation Board (PEB) Findings and Request for a Formal PEB Hearing," made no change to its preliminary finding that plaintiff's was fit to continue his Naval service. Thereafter, on February 24, 2004, the PEB informed the Chief of Naval

---

[18] Somatoform is defined as a "denoting physical symptoms that cannot be attributed to organic disease and appear to be of psychic origin." <u>Dorland's Illustrated Medical Dictionary</u> 1734 (32nd ed. 2012).

Personnel, in a Notification of Decision, that plaintiff was "found **FIT** to perform the duties of his/her office, grade, or rank on active duty," (emphasis and capitalization in original) and, stated that: "You are requested to take appropriate action to **CONTINUE THESE [sic] SERVICE MEMBER ON ACTIVE DUTY** until such active duty is terminated under other provisions of law or regulation." (emphasis and capitalization in original).

Earlier, on February 9, 2004, plaintiff had filed a disability claim with the United States Department of Veterans Affairs (VA). He underwent a disability examination, conducted by Dr. Richard Craven on February 20, 2004, and was diagnosed with the following conditions: patellofemoral[19] syndrome of the left knee; proximal motor weakness from neuropathy; bilateral cubical tunnel syndrome; lumbar sprain; motor ticks; muscle biopsy left deltoid; proximal muscle weakness, upper extremities; Obstructive Sleep Apnea requiring CPAP; Gastroesophageal Reflux Disease; Schatzki's ring,[20] post dilation; dysphagia;[21] appendectomy; hiatal hernia; external hemorrhoids; motor tics; right carpal tunnel syndrome and bilateral proximal muscle weakness (deltoids), and meralgia paresthetica.[22] The VA issued a decision on May 7, 2004, which stated in part:

1. Service connection for obstructive sleep apnea is granted with an evaluation of 50 percent effective March 20, 2004.

2. Service connection for motor tics, also claimed as continuous motor activity, with left meralgia paresthetica is granted with an evaluation of 30 percent effective March 20, 2004.

3. Service connection for right (major) upper extremity neuropathy ad myopathy with cubital tunnel syndrome is granted with an evaluation of 20 percent effective March 20, 2004.

4. Service connection for left upper extremity neuropathy ad myopathy with cubital tunnel syndrome is granted with an evaluation of 20 percent effective March 20, 2004.

---

[19] Patellofemoral is defined as "pertaining to the patella and the femur." Dorland's Illustrated Medical Dictionary 1395 (32nd ed. 2012).

[20] Schatzki's ring is defined as "a fibrous, annual constriction of the lower esophagus, usually at the junction of the esophageal and gastric mucosa." Dorland's Illustrated Medical Dictionary 1649 (32nd ed. 2012).

[21] Dysphagia is defined as "difficulty in swallowing." Dorland's Illustrated Medical Dictionary 579 (32nd ed. 2012)

[22] Meralgia paresthetica is defined as "a type of entrapment neuropathy caused by entrapment of the lateral femoral cutaneous nerve at the inguinal ligament, causing paresthesia, pain, and numbness in the outer surface of the thigh in the region supplied by the nerve." Dorland's Illustrated Medical Dictionary 1136 (32nd ed. 2012)

5.  Service connection for reflux esophagitis with hiatal hernia, with history of dysphagia. Schatzki's ring and esophageal dilation is granted with an evaluation of 10 percent effective March 20, 2004.

6.  Service connection of right (major) carpal tunnel syndrome is granted with an evaluation of 0 percent effective March 20, 2004.

7.  Service connection for biopsy, left deltoid is granted with an evaluation of 0 percent effective March 20, 2004.

8.  Service connection for hemorrhoids is granted with an evaluation of 0 percent effective March 20, 2004.

9.  Service connection for appendectomy is granted with an evaluation of 0 percent effective March 20, 2004.

10. Service connection for low back pain with annular tear at L5-S1 is granted with an evaluation of 0 percent effective March 20, 2004.

11. Service connection for patellofemoral syndrome, left knee is granted with an evaluation of 0 percent effective March 20, 2004.

12. Service connection for ocular myokymia is denied.

On February 25, 2004, D.J. Linnabary, Legal Officer, BYDIRCO NCTAMS LANT[23] issued an Administrative Counseling/Warning, stating:

1. As directed by COMNAVPERSCOM MILLINGTON TN 300938Z JAN 04 and pursuant to MILPERSMAN 1910-120, you are hereby notified that you will be processed for administrative separation by reason of convenience of the government due to your physical or mental condition.  Processing will be initiated within 30 days from the date of this notification, or sooner if waived herein.

2. Your physical or mental condition has been identified by Naval Medical Professionals specified in ICD-9 as codes 333.91 [Stiff-Man Syndrome], 530.81 [Gastroesophageal Reflux Disease manifested by heartburn] and 780.57 [Obstructive Sleep Apnea of a moderate degree] and has been diagnosed as a condition, which interferes with you serving adequately in your rate, and in the military. You were found to be unsuitable for operational duty and are therefore, nor worldwide assignable.

3. This administrative process is initiated subsequent to your completion of a regimen of therapy/treatment as ordered by your attending physician,

---

[23] The BYDIRCO NCTAMS LANT stands for By Direction of the Commanding Officer, Naval Computer and Telecommunications Area Master Station Atlantic.

which was initiated about March 2000 and has culminated with a PEB completed on 12 January 2004 resulting in a finding of "Fit to Continue on Active Duty." This period of therapy/treatment was afforded to give you an opportunity to correct your physical conditions.

Plaintiff signed the Administrative Counseling form on February 25, 2004, and placed his initials next to the following statement:

I hereby acknowledge the above Page 13 entry and desire to not make a statement. I also acknowledge the above notification and desire to waive the 30 day waiting period to initiating the administrative separation processing.

Plaintiff chose to waive his right to consult with a qualified counsel, his right to submit a statement for consideration by the separation authority, his right to request an administrative board, and his right to request transfer to the Fleet Reserve/Retired/Retired Reserve List.

On March 3, 2004, plaintiff received notice from the Commanding Officer, Naval Computer and Telecommunications Area Master Station Atlantic (NCTAMS LANT), dated February 27, 2004, indicating that he was being administratively separated pursuant to the Military Personnel Manual (MILPERSMAN) 1910-120 for a medical condition that rendered him unsuitable for operational duty. See MILPERSMAN 1910-120 (Aug. 28, 2001). On March 5, 2004, plaintiff's Commanding Officer at the NCTAMS LANT, sent a message titled "Administrative Separation Guidance" to Officer in Charge, Personnel Support Detachment, Sewells Point, which provided, in pertinent part:

Per Article 1910-120 of reference (a) [MILPERSMAN] ET1 Stein is being processed for administrative separation from the Naval Service for reason of Convenience of the Government – Physical or Mental Conditions. It is directed that he be discharged from the U.S. Navy within 10 working days from receipt of this letter. Discharge may be held in abeyance up to 30 days to allow the member the opportunity to complete transitional services if applicable.

The March 16, 2004 "Evaluation Report and Counseling Record," prepared for the purpose of "Detachment of Individual," indicated that member was "not retained due to inability to maintain a worldwide deployable status," but he nevertheless "Meets Standards" in all areas of evaluation, for which he received a numerical rating of 3.00 consisting of seven 3.0[24] ratings. In addition, the "Comments on Performance" section included the following remarks:

---

[24] The "Performance Traits" section in the "Evaluation Report and Counseling Record" included the following numerical ratings of performance: "1.0 – Below Standards; 2.0 – Progressing; 3.0 – Meets Standards; 4.0 – Above Standards; 5.0 – Greatly Exceed Standards." In the "Evaluation Report and Counseling Record," the total overall rating

Technical expert.   Develops the skills of junior personnel, producing confident and competent technicians, resulting in increased shop productivity and quality of work.

Provided valuable experience in assisting in the repairs of 44 communication circuits.

Effectively managed Department Hazmat program and inventory with 100% accuracy and no safety discrepancies.

Notably, plaintiff's four past "Evaluation Report and Counseling Record" reports also described plaintiff's performance as "Meets Standards" or better. Specifically, plaintiff received an average numerical rating of 3.86 on November 21, 2003, consisting of six 4.0 ratings and one 3.0 rating; an average numerical rating of 3.71 on November 15, 2002, consisting of five 4.0 ratings and two 3.0 ratings; an average numerical rating of 3.43 on November 19, 2001, consisting of three 4.0 ratings and four 3.0 ratings, and an average numerical rating of 3.57 on November 22, 2000, consisting of four 4.0 ratings and three 3.0 ratings. In the evaluation reports, he was described as an "excellent technician," "a proven technical expert," "[s]ought out by other technical for his expertise on a daily basis" and "a valuable asset as a watch supervisor." Plaintiff signed the "Evaluation Report and Counseling Record" on March 17, 2004, indicating that he had seen the report, had been apprised of his performance, and understood his right to submit a "statement," but he did not intend to submit one.

Plaintiff was administratively separated from the Navy on March 19, 2004, prior to the end of his enlistment period on April 14, 2004, "with an honorable characterization of service and a separation code of HFV [Unqualified for Active Duty – Other]." The Certificate of Release or Discharge from Active Duty provided that plaintiff was "discharged" because of a "condition, not disability." Plaintiff received separation pay in the amount of $23,902.53. Plaintiff's Commanding Officer at the NCTAMS LANT, submitted a memorandum to the Commander, Navy Personnel Command on June 9, 2004, summarizing plaintiff's separation as follows:

(1) Petty Officer Stein was found "Fit to Continue on Active Duty" by a PEB; however, when he went for an overseas/sea duty screening, he was found "Unsuitable" for Operational Duty. COMNAVPERSCOM was notified and directed that he be processed for administrative separation.

(2) As a result of administrative processing, I separated Petty Officer Stein from the Navy on 19 March 2004 with an honorable characterization of service and a separation code of HFV.

---

was reported as rounded to two decimal places, while each of the seven sub-categories was reported as rounded to one decimal place.

Almost six years later, plaintiff filed his complaint in this court, alleging wrongful discharge from the United States Navy and denial of retired retainer pay. Plaintiff argues that his separation for physical conditions that were determined to have rendered him unsuitable for operational duty conflicts with the determination by a Navy Physical Evaluation Board that he was fit for active duty. According to plaintiff, the MILSPERSMAN 1910-120 "usurped the statutory and regulatory scheme found in Title 10 U.S.C. §§ 1201, et seq." Consequently, plaintiff claims that he was "wrongfully denied" "the active duty basic pay that he was entitled to by 37 U.S.C. § 204," as he was discharged "for the same conditions that the PEB found not to be unfitting," in circumvention of 10 U.S.C. § 1201 and SECNAVINST 1850.4E. By allegedly wrongful discharge, plaintiff claims the Navy denied him the right to retainer pay under 10 U.S.C. § 6330, which he should have been entitled to after completing 20 or more years of active service, and a transfer to the Fleet Reserve. Also, plaintiff claims entitlement to disability retirement pay under 10 U.S.C. § 1201, as a member who was found unfit "due to conditions that are rated at least 30% under the VA Schedule for Rating Disabilities." Plaintiff sought payment of all wrongfully denied pay and allowances due to him under the law, payment of all out of pocket expenses for medical care incurred since his removal from active duty, and of costs and attorneys' fees.

After defendant filed the administrative record, and before any dispositive motions were filed, on August 6, 2010, the parties jointly requested that this court remand plaintiff's case to the BCNR.  The parties stated that remanding the case to the BCNR would present the Navy the opportunity "to correct or reconcile the interpretation and application of MILPERSMAN 1910-120 with the statutory scheme found in Title 10 U.S.C. §§ 1201, et. seq.," as well as to evaluate whether the Navy acted properly by administratively separating plaintiff.  The court granted the parties' request, and directed the BCNR to address the following matters:

> (1) to afford Mr. Stein the opportunity to present to the Navy Board any arguments and evidence that might establish his entitlement to relief regarding his separation or disability rating; (2) whether the Navy Physical Evaluation Board properly determined that Mr. Stein was fit for active duty; (3) whether the Navy acted properly and in compliance with MILPERSMAN 1910-120 in administratively separating Mr. Stein; (4) whether the Navy's administrative separation of Mr. Stein pursuant to MILPERSMAN 1910-120 constitutes a usurpation of the statutory scheme found in 10 U.S.C. §§ 1201, et. seq.; and (5) to afford Mr. Stein any relief the Navy Board determines that he is entitled to receive and to issue a decision explaining in detail the rationale supporting its final decision.

On August 31, 2010, the plaintiff submitted his Request for Correction of Naval Records (DD Form 149) to the BCNR, asking that his records "be corrected to state that he was retired for length of service or, in the alternative, that he was retired due to disabilities rated at a minimum of 80%." On December 20, 2010, the BCNR issued a decision denying plaintiff's application. First, the BCNR concluded that plaintiff's

"application was not timely filed, and that it would not be in the interest of justice to excuse your failure to submit your application in a timely manner." The BCNR stated, in part:

> Although you maintain that you discovered the alleged error or injustice on 17 March 2010, you knew on 19 March 2004 that you were not permitted to reenlist in the Navy and that you were being discharged for the convenience of the government without entitlement to disability benefits administered by the Department of the Navy.

The BCNR nevertheless considered plaintiff's application on the merits and concluded that plaintiff had failed to submit sufficient evidence to demonstrate the existence of probable material error or injustice in his record. Specifically, the BCNR decided that the PEB finding of fit for duty did not preclude plaintiff's separation under MILPERSMAN 1910-120, because the "Department of Defense Directive (DODD) 1330.14[25], Enlisted Administrative Separations, paragraph E3.A1.1.3.4.8.1, permits the Military Service Secretaries to authorize the separation of a service member for condition not amounting to disability "that potentially interfered with assignment to or performance of duty," and the Secretary of the Navy's authorization, by SECNAVINST 1910.4, Section C, Convenience of the Government, paragraph 4h, was "implemented within the Navy by MILPERSMAN 1910-120." The BCNR also noted that plaintiff was found fit by the PEB. According to the BCNR, he was not disabled because in order to find a member disabled, "it must be established that the condition actually interfered significantly with the member's ability to carry out the duties of his or her office, grade, rank or rating" and that "a condition is not considered a disability unless it is found to be unfitting and ratable by the PEB."  Therefore, the BCNR concluded there was "material compliance" with the provisions of MILPERSMAN 1910-120 in plaintiff's administrative separation.

With regard to plaintiff's request for retention on active duty until he qualified for transfer to the Fleet Reserve, the BCNR noted that had plaintiff "not been discharged for the convenience of the government," plaintiff's enlistment would have expired on April 14, 2004, and that plaintiff had no right to reenlist at the expiration of his obligated service. Therefore, the BCNR found that plaintiff's discharge was "a valid, constructive separation" which, according to the BCNR, had "characteristics of a voluntary separation," given plaintiff's waiver of the thirty day waiting period before the initiation of separation processing, signed by plaintiff on February 25, 2004. Finally, the BCNR noted that the plaintiff failed to demonstrate that, had he been retained on active duty, he would have been entitled to promotion, as he received "a de facto adverse evaluation" in the past, was "criticized for 'fair' performance," and "apparently did not achieve any of the warfare qualifications, which were *de facto*, although not *de jure*, requirements for promotion to chief petty officer at the time in question."  (emphasis in original).

---

[25] The court notes that the BCNR's decision incorrectly refers to the Department of Defense Directive (DODD) 1330.14. The correct citation is DODD 1332.14.

Upon the parties' request the court remanded the above-captioned case to the BCNR for the second time, on April 29, 2011,[26] with specific instructions to consider issues not raised in the earlier remand and to clarify certain, limited matters previously considered.  Specifically, the court instructed the BCNR to address the following issues:

1.  Whether, to the extent that the BCNR relies upon the suitability screening conducted by HMC Hansen to constitute the requisite documentation by a medical officer that Mr. Stein was incapable of completing his obligated service in any capacity, HMC Hansen qualifies as a medical officer.

2.  Assuming for the sake of argument that the BCNR concludes that the HMC Hansen qualifies as a medical officer, whether the incomplete and unsigned suitability screening qualifies as medical documentation by a medical officer that Mr. Stein was incapable of completing his obligated service in any capacity as required by MILPERSMAN 1910-120.

3.  Whether and, if so, how the determination that Mr. Stein was operationally unsuitable amounts to a determination that he was incapable of completing his militarily service in any capacity.

4.  Whether and, if so, how the findings of the MEB that Mr. Stein's sleep apnea and gastroesophageal reflux did not interfere with his ability to perform his duties affect the correction board's conclusion that the suitability screening finding Mr. Stein was operationally unsuitable amounts to a determination that he was incapable of completing his military service in any capacity.

5.  Whether and, if so, how the apparent determinations by the MEB and the PEB that Mr. Stein did not suffer from stiffman syndrome after the suitability screening affect the correction board's conclusion the suitability screening finding Mr. Stein was operationally unsuitable amounts to a determination that he was incapable of completing his military service in any capacity related to the diagnosis of stiffman syndrome.

6. Whether the reference to the unsuitability screening results in Mr. Stein's recommendation for separation is sufficient to satisfy the requirement in MILPERSMAN 1910-120 that the documentation be "forwarded" to NAVPERSCOM or the request would be disapproved.

7.  Whether Mr. Stein's commanding officer's submission of the recommendation for administrative separation after Mr. Stein had been

---

[26] Between the BCNR's decision issued on December 20, 2010 and the second remand on April 29, 2011, the parties filed a supplement to the administrative record, multiple motions for extension of time, status reports, an amended administrative record, a joint stipulation of facts and a joint statement of issues of fact and law.  The parties' new filings during this period raised new issues not previously considered by the BCNR.

administratively separated was in compliance with the requirements of MILPERSMAN 1910-120.

8.  Whether there is sufficient evidence to support Mr. Stein's separation pursuant to MILPERSMAN 1910-120.

9. Whether Mr. Stein's weight was a factor in denying Mr. Stein's application to the BCNR.

On March 19, 2012, the BCNR issued another decision denying Mr. Stein's application for correction of military records.  Specifically, the BCNR concluded:

Most of the questions in the JMR (Joint Motion for Remand) are based on the erroneous assumption that the provisions of the Navy Military Personnel manual (MILPERSMAN) article 1910-120, paragraph 2c, are applicable to your case . . . .

MILPERSMAN article 1910-120, paragraph 2c, provides that certain documentation must accompany requests for separation "Whether command- or service member-initiated."  As the separation action in your case was initiated by the Commander, Navy Personnel Command (COMNAVPERSCOM), the cited paragraph was inapplicable to your case, and your command was not required to submit the specified documentation to COMNAVPERSCOM.

The version of MILPERSMAN article 1910-120, that was in effect in early 2004 was ill-considered and not well-written.  Its purpose was to provide a means of separating service member who although not disabled, i. e., unfit for duty for reason of physical disability, were not operationally suitable or world-wide assignable because of one or more of the conditions listed in that article or specified by proper authority.  If the words "in any capacity" are applied literally, MILPERSMAN article 1910-120 is vitiated, because none of the listed or likely to be specified conditions would prevent service members from completing their service "in any capacity."

If the Court determines that the provisions of MILPERSMAN article 1910-120, paragraph 2c, are applicable to your case, and that being unable to complete your obligated service "in any capacity" was a prerequisite to your separation under the provisions of MILPERSMAN article 1910-120, the Board would have to conclude that your separation was not in accordance with those provisions, as you were capable of performing duty ashore in a non-operational setting, and your did so for more than three years after you were initially found to be operationally unsuitable in 2001.  In that case, it would be appropriate to correct your record to show that you were discharged by reason of Secretarial authority or expiration of active obligated service (EAOS).

Addressing the first of the nine issues remanded by this court, the BCNR decided that although the term "medical officer" is not defined in MILPERSMAN 1910-120, the independent duty corpsmen are "credentialed to provide a wide range of medical services," including "perform[ing] suitability screenings such as those conducted in [plaintiff's] case by HMC [Chief Hospital Corpsman] Hansen and HMC Pelzel, who were IDCs [independent duty corpsmen]." In addition, the BCNR noted that their findings were supported by the findings of plaintiff's MEBs and PEB.

With respect to the issue of whether the incomplete and unsigned suitability screening qualifies as medical documentation by a medical officer, the BCNR noted that the determination regarding unsuitability made by HMC Hansen on January 20, 2004 was endorsed by HMC Pelzel, who conducted plaintiff's suitability screening in 2001 and found plaintiff "not operationally suitable at that time." In addition, the BCNR stated that administrative form signed by HMC Pelzel indicated that the "Medical Officer/Specialist finding noted in medical record: Found fit for continued service by PEB, however, still suffers from above conditions."  The BCNR concluded that "if there was a requirement for documentation from a medical officer beyond that which is already present in your file, which it does not believe there was, the endorsed screening form substantially complies with that requirement."

As to the third issue, whether the finding of "operationally unsuitable" amounts to a determination that plaintiff was incapable of completing his militarily service in any capacity, the BCNR decided that since plaintiff was "in a de facto limited duty status for more than three years during time of war," enjoying "exemption from physical fitness testing and body composition assessments," plaintiff was "incapable of completing [his] enlistment in a capacity commensurate with [his] grade and years of service and the Navy's need for operationally suitable petty officers in time of war."

On the fourth issue, the BCNR decided that although plaintiff's conditions were relatively minor and "certainly not unfitting," "those finding do not establish that you were operationally suitable and/or worldwide assignable vis-à-vis either condition." In particular, the BCNR noted that plaintiff's reliance on a continuous positive airway pressure device (CPAP), "by itself was a sufficient basis for finding you [plaintiff] operationally unsuitable," due to the fact that many Navy warships, as well as austere operational shore locations overseas, did not have sufficient electrical outlets available "to permit uninterrupted use of a CPAP device, and also lacked CPAP supplies and maintenance capability." Moreover, "[a]ssignment limitation for CPAP users remained in effect after you were discharged, and restricted their assignment to warships, Navy hospital ships, and deployed units of the U.S. Central Command."

With respect to the fifth issue, the BCNR noted that the 2003 determinations of MEB and PEB, that plaintiff suffered from motor tics rather than Stiff-Man Syndrome, "had no significant effect on the BCNR's conclusions" as "[t]he manifestations of that condition were the same regardless of what it was called," and "a change in diagnosis does not

change the particular manifestation of the underlying condition that you experienced," "which rendered you operationally unsuitable."

On the issue of whether the reference to unsuitability screening result is sufficient to satisfy the requirement in MILPERSMAN 1910-120 that the documentation be "forwarded" to NAVPERSCOM or the request would be disapproved, the BCNR noted that although COMNAVPERSCOM directed that plaintiff be processed for separation, it did not act as the separation authority, thus, "consequently, no 'request' for separation was presented to COMNAVPERSCOM for action, and there was no recommendation for COMNAVPERSCOM to approve, disapprove or return for further action." Moreover, the BCNR determined that MILPERSMAN 1910-120, ¶ 2c, was inapplicable to plaintiff's case.

With respect to the seventh issue, regarding the delay of the commanding officer in submitting the recommendation for administrative separation, the BCNR clarified that "[t]he document in question, although styled a recommendation for discharge, was actually a report of separation." Therefore, "[t]he delay in notifying COMNAVPERSCOM that you had been separated did not render 'the Navy noncompliant with the requirements of MILPERSMAN 1910-120.'"

Addressing the question of sufficiency of evidence to support plaintiff's separation, the BCNR noted that "although your [plaintiff's] symptoms were minimal, and probably did not support referral to a second PEB, you were operationally unsuitable and not worldwide assignable." The BCNR also stated that plaintiff's

> separation was tantamount to a voluntary discharge, and was, at the very least, constructively valid, given your waiver of your right to a hearing before an administrative discharge board, your failure to contest the proposed separation, and your plan to be separated and seek benefits from the Department of Veterans Affairs (VA) if you were not retired by reason of physical disability.

Finally, regarding whether plaintiff's weight was a factor in denying plaintiff's application to BCNR, the Board stated that the application was denied "because it was not timely and you [plaintiff] failed to demonstrate that it would be in the interest of justice for the Board to consider it notwithstanding its lack of timeliness," concluding that "[t]he Board would have denied your application irrespective of your weight."

The BCNR also determined that it was permissible for the PEB to find Mr. Stein fit for duty, and, therefore, not eligible for disability pay, and at the same time, also to find him not suitable for deployment or operational duty and, as a result, to separate him and deny him reenlistment. The BCNR pointed to the DOD Directive 1332.14, dated December 21, 1993, in effect in early 2004, ¶ E3.A1.1.3.4.8.1, which provided:

> The Secretary concerned may authorize separation on the basis of other designated physical and mental conditions, not amounting to Disability . . . that potentially interfered with assignment to or performance of duty under

the guidance set forth in section E3.A2.1.1. of Part 2.  Such conditions may include but are not limited to chronic seasickness or airsickness, enuresis, and personality disorder.

DODD 1332.14, ¶ E3.A1.1.3.4.8.1 (Dec. 21, 1993).

The BCNR concluded:

The cited directive permits the administrative separation of service members due to conditions that have been evaluated by a PEB and not found to be unfitting.  The Board also noted that Secretary of the Navy Instruction (SECNAVINST) 1850.4E, paragraph 1004 c (2) (a) provides in part that "Within a finding of Fit [sic] to continue naval service is the understanding that the mere presence of a diagnosis is not synonymous with a disability."  Paragraphs 1004 c (2) (a) and 2033 provide, in effect, that a PEB determination of fitness to continue naval service does not preclude subsequent non-PEB determinations of temporary unfitness for specific assignments, unsuitability for deployment or physical readiness test (PRT) participation, disqualification from special duties, and/or administrative action including separation resulting from such determinations.

(bracket in original). The BCNR also noted that:

MILPERSMAN article 1306-140, Transfer of Enlisted Personnel to Operational Duty, then in effect, suggested that administrative separation was appropriate in the case of an enlisted service member who had undergone· operational suitability screening and been found not operationally suitable.

Following the second remand decision by the BCNR, the court ordered the administrative record to be supplemented by the documents that were a part of the second remand. The court also ordered the parties to file revised joint stipulations of facts as well as issues of fact and law. In responding to the court's Orders, the parties seriously disagreed about the posture of the case and how to proceed. Ultimately, the government moved to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) (2014) for failure to state claims upon which relief can be granted. Defendant urges the court to dismiss plaintiff's complaint, alleging that plaintiff has failed to identify any statute, regulation, or other authority establishing his right to back pay and allowances, beyond the expiration of his enlistment on April 14, 2004. Moreover, according to defendant, plaintiff has not identified any statute, regulation, or other authority conferring upon him a right to enlisted retained pay, to be promoted, or to payment of any unreimbursed health care expenses "incurred since his removal from active duty." Defendant further contends that plaintiff's challenge to the merits of the PEB's finding of fit to continue on active duty presents a nonjusticiable claim, as plaintiff did not point out to any failure in Navy's procedure, but rather, his claims are directed at the merits of PEB determination of fit for duty. In the alternative, defendant filed a motion

for judgment on the administrative record, arguing that "[t]he BCNR's decision denying the relief sought was not arbitrary, capricious, in bad faith, unsupported by substantial evidence, or contrary to law."

Plaintiff responds by filing a cross motion for judgment on the administrative record asking the court to deny the motion to dismiss, arguing that his "claims are justiciable" because "there are clear standards that can be applied to the Navy's errors in this case." Citing 10 U.S.C. § 1214, plaintiff asserts that "his entitlement to back pay flows from his discharge for a disability without being afforded a hearing." According to plaintiff, his right to retainer pay is also allegedly based on that statue, because "10 U.S.C. § 1214 gives him a right to be credited with years of back pay and service.  If this is true, then at this point, Mr. Stein would be at more than 20 years of service and would qualify for retainer pay."  Moreover, plaintiff argues that this court has jurisdiction with respect to his back pay claims based on 10 U.S.C. § 1552, in order to correct "an error or remove an injustice."

## DISCUSSION

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither

party has raised this issue." <u>Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings</u>, 370 F.3d 1354, 1369 (Fed. Cir.) (citing <u>Textile Prods., Inc. v. Mead Corp.</u>, 134 F.3d 1481, 1485 (Fed. Cir.), <u>reh'g denied and en banc suggestion declined</u> (Fed. Cir.), <u>cert. denied</u>, 525 U.S. 826 (1998)), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2004), <u>cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.</u>, 546 U.S. 975 (2005), <u>cert. dismissed as improvidently granted</u>, 548 U.S. 124 (2006).

In examining what must be pled in order to state a claim, under both RCFC 8(a)(2) and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2014); Fed. R. Civ. P. 8(a)(2) (2015); <u>see also Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). The United States Supreme Court stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [<u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)]; <u>Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.</u>, 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, <u>see Papasan v. Allain</u>, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, <u>see</u> 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), <u>see</u>, <u>e.g.</u>, <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508, n.1 (2002); <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555–56, 570 (footnote and other citations omitted; omissions in original); <u>see also Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555–57, 570); <u>A&D Auto Sales, Inc. v. United States</u>, 748 F.3d 1142, 1157 (Fed. Cir. 2014); <u>Bell/Heery v. United States</u>, 739 F.3d 1324, 1330 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2014); <u>Kam-Almaz v. United States</u>, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 557)); <u>Totes-Isotoner Corp. v. United States</u>, 594 F.3d 1346, 1354–55 (Fed. Cir.), <u>cert. denied</u>, 131 S. Ct. 92 (2010); <u>Bank of Guam v. United States</u>, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege

facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Housing Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726–27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of New York v. United States, 92 Fed. Cl. 285, 292, 298, 298 n.14 (2010).

Regarding motions for judgment on the administrative record, the court's inquiry is directed to "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Mgmt. and Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005)); see also Vellanti v. United States, 119 Fed. Cl. 570, 577-78 (2015) (quoting Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 751 (2012)) ("RCFC 52.1 governs motions for judgment on the administrative record. . . . Unlike summary judgment, for instance, 'a genuine dispute of material fact does not preclude a judgment on the administrative record.'").

In general, the court reviews a BCNR's determination "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." Lewis v. United States, 458 F.3d 1372, 1376 (Fed. Cir.) (citing Martinez v. United States, 333 F.3d 1295, 1305, 1314 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004)), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 552 U.S. 810 (2007); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence."); Barnick v. United States, 591 F.3d 1372, 1377 (Fed. Cir. 2010); Barnes v. United States, 473 F.3d 1356, 1361 (Fed. Cir.) ("We apply the same standard of review as the United States Court of Federal Claims, which means 'we will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005)), cert. denied, 552 U.S. 813 (2007); Metz v. United States, 466 F.3d 991, 998 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006); Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir. 1998), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 528 U.S. 809 (1999); Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983); Skinner v. United States, 219 Ct. Cl. 322, 331, 594 F.2d 824, 830 (1979); Spellissy v. United States, 103 Fed. Cl. 274, 283 (2012) ("[W]hen a service member chooses to seek relief from a military corrections board, the court 'will not disturb the decision of [a] corrections board unless it

is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting Chambers v. United States, 417 F.3d at 1227) (second modification in original)). In Riser v. United States, the United States Court of Federal Claims noted that plaintiff must show that the decision by the ABCMR was arbitrary and capricious, contrary to law, or unsupported by substantial evidence, and that, in accordance with this deferential standard of review, the court does not reweigh the evidence, "but rather considers whether *the conclusion being reviewed* is supported by substantial evidence. So long as the Board considered the relevant evidence and came to a reasonable conclusion, this court will not disturb the Board's decision." Riser v. United States, 97 Fed. Cl. 679, 683–84 (2011) (quoting Heisig v. United States, 719 F.2d at 1157) (emphasis in original; other citations omitted); see also Fisher v. United States, 402 F.3d 1167, 1177 (Fed. Cir. 2005); Heisig v. United States, 719 F.2d at 1156 ("[C]ourts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence."); Martinez v. United States, 77 Fed. Cl. 318, 324 (2007), aff'd, 260 F. App'x 298 (Fed. Cir. 2008); Peterson v. United States, 104 Fed. Cl. 196, 204 (2012); Holmes v. United States, 98 Fed. Cl. 767, 780–81 (2011) ("'The Board's decision will comply with the substantial evidence standard so long as a 'reasonable mind might accept' [the] particular evidentiary record as "adequate to support [the contested] conclusion."'" (quoting Dickinson v. Zurko, 527 U.S. 150, 162 (1999) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938))) (modifications in original)). Plaintiff bears the burden of showing that the Board's decision denying plaintiff's application to correct his military record was arbitrary, capricious, and unsupported by substantial evidence. See Wronke v. Marsh, 787 F.2d 1569, 1576 (Fed. Cir.), cert. denied, 479 U.S. 853 (1986).

This standard of review is narrow. The United States Court of Appeals for the Federal Circuit has emphasized that in cases involving military personnel decisions, "'the military is entitled to substantial deference in the governance of its affairs.'" Antonellis v. United States, 723 F.3d 1328, 1332 (Fed. Cir. 2013) (quoting Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir.), reh'g denied (Fed. Cir. 1993)); see also Taylor v. United States, 106 Fed. Cl. 443, 451 (2012), aff'd, 530 F. App'x 963 (Fed. Cir. 2013) (citing Friedman v. United States, 159 Ct. Cl. 1, 310 F.2d at 386–87). Additionally, the court does not sit as "a super correction board." Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 830; see also Voge v. United States, 844 F.2d 776, 782 (Fed. Cir.) (The "court does not function as 'a sort of super Correction Board.'" (quoting Reale v. United States, 208 Ct. Cl. 1010, 1013, 529 F.2d 533, cert. denied, 429 U.S. 854 (1976))), cert. denied, 488 U.S. 941 (1988).

Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." Dodson v. United States, 988 F.2d at 1204. The plaintiff bears the burden of overcoming the "'strong, but rebuttable, presumption' that the military discharges its duties 'correctly, lawfully, and in good faith.'" Bernard v. United States, 59 Fed. Cl. 497, 501 (quoting Hary v. United States, 223 Ct. Cl. 10, 17, 618 F.2d 704, 707 (1980) (citations omitted)), aff'd, 98 F. App'x 860 (Fed. Cir.), reh'g denied (Fed. Cir. 2004);

see also Spellissy v. United States, 103 Fed. Cl. 274, 283 (2012); Boyle v. United States, 101 Fed. Cl. 592, 596 (2011) (citing Richey v. United States, 322 F.3d at 1326).

"'[J]udges are not given the task of running the Army.'" Antonellis v. United States, 723 F.3d at 1332 (quoting Orloff v. Willoughby, 345 U.S. 83, 93, reh'g denied, 345 U.S. 931 (1953); see also Parker v. Levy, 417 U.S. 733, 743 (1974); Murphy v. United States, 993 F.2d at 872-73. More generally, the United States Supreme Court, however, also has stated:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) [reh'g denied and reh'g denied sub nom. SEC v. Fed. Water & Gas Corp. (1947)]. We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. [281,] 286, 95 S. Ct. 438, 42 L. Ed. 2d 447 [(1974)]. See also Camp v. Pitts, 411 U.S. 138, 142–143, 93 S. Ct. 1241, 36 L. Ed. 2d 106 (1973) (per curiam).

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43–44 (1983) (other citations omitted); see also SKF USA Inc. v. United States, 630 F.3d 1365, 1373 n.3 (Fed. Cir. 2011)). In sum, as a Judge of the United States Court of Federal Claims explained in Verbeck v. United States, a military pay case:

> The court's review in these matters is thus limited in scope and deferential in nature. Ms. Verbeck must show that the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence. See Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005) [cert. denied, 546 U.S. 1066 (2005)]; Godwin v. United States, 338 F.3d 1374, 1378 (Fed. Cir. 2003); Heisig [v. United States], 719 F.2d [1153, 1156 (Fed. Cir. 1983)]. . . . The Board's decision will comply with the substantial evidence standard so long as a "'reasonable mind might accept' [the] particular evidentiary record as 'adequate to support [the contested] conclusion.'" Dickinson v. Zurko, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (quoting Consolidated Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Similarly, the arbitrary and capricious standard "requires a reviewing court to sustain an action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir.[), reh'g denied (Fed. Cir. 2000)].

In sum, the court must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it. See Heisig, 719 F.2d at 1157 ("Under the substantial evidence rule, *all* of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."); Van Cleave v. United States, 70 Fed. Cl. 674, 678–79 (2006) (While the court does not "serve as a 'super correction board[,]' Skinner v. United States, [219 Ct. Cl. at 331] . . . correction boards must examine relevant data and articulate satisfactory explanations for their decisions.") (citations omitted). If the Board "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" its decision runs afoul of even this lenient standard of review. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

Verbeck v. United States, 97 Fed. Cl. 443, 451 (2011) (second omission in original); see also PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058).

This court's review "does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence." Heisig v. United States, 719 F.2d at 1157 (emphasis in original); see also Riser v. United States, 97 Fed. Cl. at 683–84. A fit for duty determination is supported by substantial evidence as long as relevant evidence exists "'that a reasonable mind might accept as adequate to support a conclusion.'" Joslyn v. United States, 110 Fed. Cl. 372, 389 (2013) (quoting Jennings v. Merit Sys. Prot. Bd., 59 F.3d 159, 160 (Fed. Cir. 1995)).

**Entitlement to Back Pay and Allowances**

Plaintiff argues that his right to back pay and allowances[27] is based on the Military Pay Act, 37 U.S.C. § 204. The Federal Circuit has "long recognized that the Military Pay Act "provides for suit in [the Claims Court] when the military, in violation of the Constitution, a statute, or a regulation, has denied military pay." Antonellis v. United States, 723 F.3d at 1331 (quoting Dysart v. United States, 369 F.3d 1303, 1315 (Fed. Cir. 2004)) (alternation in Antonellis v. United States); see also Vellanti v. United States, 119 Fed. Cl. at 576; Klingenschmitt v. United States, 119 Fed. Cl. 163, 180 (2014).

---

[27] Navy allowances, can include certain housing benefits, additional compensation for separation from family, hazardous duty, or special duty, reenlistment bonus, clothing allowance to offset the cost of purchase of uniforms, and tax advantages.

As explained by the Federal Circuit:

In the context of military discharge cases, the applicable "money-mandating" statute that is generally invoked is the Military Pay Act, 37 U.S.C. § 204. In order to bring a military discharge case in the Court of Federal Claims, a plaintiff therefore must allege that, because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge.

Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003).

It also is "well established that claims for back pay stemming from allegedly unlawful separation from active duty in the armed services are within the jurisdiction of the Court of Federal Claims under 28 U.S.C. 1491(a)." Spehr v. United States, 51 Fed. Cl. 69, 81 (2001), aff'd, 49 F. App'x 303 (Fed. Cir.), reh'g denied (Fed. Cir. 2002), mot. for relief from judgment denied, 2005 WL 6115388 (Fed. Cl. May 27, 2005); see also Miller v. United States, 119 Fed. Cl. 717, 729 (2015); Hwang v. United States, 94 Fed. Cl. 259, 270 (2010), aff'd, 409 F. App'x 348 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2011). The Military Pay Act, providing that member who is on active duty is "entitled to the basic pay of the pay grade to which [he is] assigned." 37 U.S.C. § 204(a). The Federal Circuit has indicated that, "[i]f the discharge was wrongful the statutory right to pay continues; this right serves as the basis for Tucker Act jurisdiction." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.), reh'g denied (Fed. Cir. 1997); see also Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006) (quoting 37 U.S.C. § 204(a)) ("[T]he Military Pay Act has previously been held to be money-mandating. . . . That is because § 204 provides that a member of a uniformed service who is on active duty is "entitled to the basic pay of the pay grade to which assigned.'"); Houghtling v. United States, 114 Fed. Cl. 149, 156 (2013).  As noted by this court, "[c]laims for allowances incident to active-duty military service are also typically within the jurisdiction of the court when brought in a wrongful discharge suit." Anderson v. United States, 111 Fed. Cl. 572, 579 (2013) (citing Miglionico v. United States, 108 Fed. Cl. 512, 520 (2012)), aff'd (Fed. Cir. 2014). In order to bring an action for back pay, based on a military discharge, a plaintiff "must allege that, because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge." Flowers v. United States, 80 Fed. Cl. 201, 215 (quoting Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003)), aff'd, 321 F. App'x 928 (Fed. Cir. 2008), reh'g and reh'g en banc denied (Fed. Cir. 2009).

The Federal Circuit, however, has made clear that "no one has a right to enlist or reenlist in the armed forces, unless specially given one by statue or regulation." Dodson v. United States, 988 F.2d 1199, 1203-04 (Fed. Cir.), reh'g denied, (Fed. Cir. 1993). Thus, "an enlisted serviceman who has been improperly discharged is entitled to recover pay and allowances only to the date on which his term of enlistment would otherwise have expired had he not been so discharged." Id.; see also Flowers v. United States, 80 Fed. Cl. at 217.

Plaintiff claims he is entitled to back pay and allowances from the day of his discharge, March 19, 2004, to present.  Plaintiff's enlistment, however, was scheduled to expire on April 14, 2004, and there is no evidence in the record before the court that plaintiff had a right to remain in the Navy beyond the April 14, 2004 date.  Defendant argues that "Mr. Stein fails to identify any statute, regulation, or other authority conferring upon him a right to reenlist upon the expiration of his enlistment, and no such right exists in his case." (footnote omitted).  As repeatedly noted, "[t]he Court of Federal Claims lacks the authority to order reinstatement after a servicemember's enlistment term has expired," as Section 204 "does not contain the authority to reinstate servicemembers in the armed forces."  Harper v. United States, 104 Fed. Cl. 287, 293 (2012) (citing Dodson v. United States, 988 F.2d at 1208); see also Dodson v. United States, 988 F.2d at 1203-04 (citing Maier v. Orr, 754 F.2d 973, 980 (Fed. Cir. 1985) "[N]o one has a right to enlist or reenlist in the armed forces, unless specifically given one by statute or regulation."); Hwang v. United States, 94 Fed. Cl. at 264 ("It is well established that this Court lacks jurisdiction to reinstate a serviceman once his term of enlistment has expired." (citing Thomas v. United States, 42 Fed. Cl. 449, 453 (1998), aff'd, 217 F.3d 854 (Fed. Cir. 2009))).

Plaintiff cannot demonstrate that he had a right to reenlistment based on 37 U.S.C. § 204 beyond the expiration of his enlistment term on April 14, 2004 as the right to pay and allowances under the Military Pay Act, 37 U.S.C. § 204, ceased for plaintiff that day. This court, therefore, has no authority to order reimbursement of plaintiff's pay and allowances past April 14, 2004, when plaintiff's latest enlistment was to expire. The government, however, has conceded that Mr. Stein does have a right to receive back pay and allowances for the time period between his separation and the expiration of his enlistment. Defendant states plaintiff "is entitled to the back pay and allowances due to him for the 26 days between the date he was discharged and the end of his obligated service, April 14, 2004." Plaintiff, therefore, should be awarded any back pay and allowances he would have received if he had remained in service until the end of his enlistment period, i.e., from March 19, 2004 to April 14, 2004.

The court notes that the record further reflects that Mr. Stein was not authorized to extend his enlistment without prior approval.  The administrative record indicates that plaintiff was not allowed to reenlist without "prior approval from PERS 832." Plaintiff appears to claim, however, that he had a right to reenlistment, as, according to plaintiff, "were it not for my erroneous separation I would have been eligible to reenlist." The record, however, does not support plaintiff's claim. The court agrees with the BCNR, which noted in its March 19, 2012 decision: "There is no indication in the available records that COMNAVPERSCOM ever lifted the restriction on your reenlistment that he imposed in 2001." The BCNR also noted: "Your commanding officer did not have authority to reenlist you to [sic] while that restriction remained in effect."

The administrative record further demonstrates that in plaintiff's March 8, 2004 interview, prior to his separation: "Stein, Kevin Michael states he/she does not intend to reenlist on board." Moreover, plaintiff did not apply for reenlistment in 2004. Mr. Stein's "Certificate of Release or Discharge from Active Duty," in the section "Reentry Code," indicated that plaintiff received a "RE-3G." "Condition (not physical disability) interfering

with performance of duty." Despite the entry of such a code, plaintiff chose not to challenge the designation at the time.  It also appears plaintiff believed he was disabled, and that he did not intend to reenlist in the Navy, but rather planned to go for a disability retirement from the Navy.  Plaintiff's "Report of Medical Assessment" dated September 22, 2009, provided: "[i]f PEB is not accepted then separation date on 20031014 will occur will seek VA disability" In addition, plaintiff did not seek reenlistment prior to June 2011, or the time of the submission of his application to the BCNR, either through naval administrative channels following his separation, or in the complaint filed in this court.

Additionally, the Secretary of the Navy may prescribe regulations for the acceptance of reenlistment, see 10 U.S.C. § 505(d) (2012); 10 U.S.C. § 508(b) (2012), and the Secretary has prescribed regulations on the eligibility standard for reenlistment. The pertinent Navy regulation in effect at the time period of plaintiff's discharge, MILPERSMAN 1160-030 (22 Aug. 2002), provides that in order to be eligible for reenlistment, "a member must be medically qualified; meet the eligibility standards prescribed . . . ; have been recommended by the member's commanding officer (CO) for reenlistment; and meet quality control standards . . . ."  MILPERSMAN 1160-030, ¶ 3.b. Plaintiff cannot demonstrate that he complied with Navy regulations, even absent any alleged "erroneous separation."

Plaintiff alternatively argues that his right to back pay and allowances is not based on an automatic right to reenlistment, but, instead, is based on 10 U.S.C. § 1214, for "his discharge for a disability without being afforded a hearing," thereby entitling him to pay under 37 U.S.C. § 204 up to the moment he is afforded a proper "formal Physical Evaluation Board hearing." Plaintiff claims that he

> argued before the BCNR that his entitlement to back pay flows from his discharge for a disability without being afforded a hearing. If Mr. Stein is correct, as he argued to the BCNR, that 10 U.S.C. §1214 gives him a substantive right to not be separated due to "disabilities" without a formal hearing, then he has stated a claim upon which relief may be granted. There are sufficient standards to judge the Navy's actions and Mr. Stein has alleged sufficient facts that, if he is correct, would entitle him to relief. Therefore, the defendant's motion to dismiss should be denied.

(internal citation omitted). Plaintiff also makes the argument, that although "[c]ounsel for Mr. Stein is not aware of a single case where a plaintiff has successfully raised an entitlement to continued service based on 10 U.S.C. § 1214. However, it there ever was a case that would fit the requirements of such an entitlement, it is Mr. Stein's case."

Defendant responds that "Mr. Stein was not separated for physical disability pursuant to the disability statutes and regulations; he was separated for physical conditions not amounting to unfitting disabilities." Consequently, defendant argues that "Mr. Stein's conditions were specifically found not to be unfitting. Because he was found fit and was therefore not separated for disability, he was simply not entitled to a formal PEB."

Section 1214 of Title 10 of the United States Code provides: "No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it." 10 U.S.C. § 1214. The language of 10 U.S.C. § 1214 limits its application to cases of retirement or separation for physical disability, and is not applicable to conditions that render a member unsuitable for operational duty. The BCNR informed plaintiff that "[y]ou did not have the right to a hearing before the PEB because you were found fit for duty," although "unsuitable for operational duty." Mr. Stein was found fit and was therefore not separated for disability. The February 25, 2004 Administrative Counseling/Warning, stated as follows:

> Your physical or mental condition has been identified by Naval Medical Professionals specified in ICD-9 as codes 333.91 [Stiff-Man Syndrome], 530.81 [Gastroesophageal Reflux Disease manifested by heartburn] and 780.57 [Obstructive Sleep Apnea of a moderate degree] and has been diagnosed as a condition, which interferes with your serving adequately in your rate, and in the military. You were found to be unsuitable for operational duty and are therefore, nor worldwide assignable.

Additionally, the MEB and the PEB determined plaintiff suffered from motor tics, and the PEB determined the tics were not "disabling."[28] The court agrees with defendant that "Mr. Stein's conditions were specifically found not to be unfitting . . . he was simply not entitled to a formal PEB." Therefore, 10 U.S.C. § 1214 does not apply, and would not have entitled plaintiff to a formal PEB.

Despite the foregoing, plaintiff also argues that his conditions should have been classified as disabilities, necessitating a formal PEB hearing. Plaintiff claims that he was, in fact, separated for disability, because "despite being found fit by the PEB, I [he] was treated by the Navy as being unfit." According to plaintiff, "[i]t was his unfitness that resulted in his separation from the Navy," and "the facts of this case demonstrate that he was actually separated for physical disability." Plaintiff maintains that both 10 U.S.C. § 1214 and 10 U.S.C. § 1216a, are "binding on the Secretary of the Navy to the extent that the court would use these to analyze the applicability of the general schedule to rate disabilities," and, that such an "approach should be adopted by the BCNR and the Secretary of the Navy." Plaintiff further argues:

> If a condition is part of a person's make-up and cannot change, it should be classified as a defect. However, a condition that changes, or is capable of changing, should be classified as a disease- which is by definition a disability. From this premise, it is not the degree of impairment that controls in determining whether a condition is a disability . . . . It is whether or not the condition is either a disease or, by necessity (normally part of a person's make-up) stationary. The exception to this general rule is when a condition that is not capable of changing is the result of a causative disorder. In Mr.

---

[28] As noted above, although the September 17, 2003 MEB report determined that plaintiff suffered from Stiff-Man Syndrome, the addendum to the report, issued on January 22, 2004, modified that diagnosis, to "Final Diagnosis: Motor Tics."

Stein's case, it is clear that his conditions are diseases, but even discounting this part of the definition, they are disabilities as they in fact changed (from non-existent to causing limitations on his ability to perform duties). In addition, his conditions, which changed over time, are the result of causative disorders- Stiffman's Syndrome (and/or other neurological conditions), sleep apnea, and GERD. As a consequence, Mr. Stein should never have been separated under MILPERSMAN 1910-120 for conditions that "do not amount to a physical disability." His conditions were a result of diseases and were disabilities.

Defendant dismisses plaintiff's arguments, stating that Mr. Stein "relies largely on a novel, idiosyncratic, erroneous, and ultimately irrelevant interpretation of applicable regulations." Defendant notes, quoting from Aeolus Systems, LLC v. United States, that "'an agency's interpretation of its own regulations is "controlling" unless "plainly erroneous or inconsistent with" the regulations being interpreted.'" Aeolus Sys., LLC v. United States, 79 Fed. Cl. 1, 9 (2007) (quoting Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 171 (2007) (quoting Auer v. Robbins, 519 U.S. 452, 461 (1997))). Defendant argues that Congress granted the service Secretaries "exceedingly broad — indeed, nearly unfettered — discretion in prescribing regulations for their respective services' disability evaluation systems. See 10 U.S.C. 1216 (a)-(b)." Based on that authorization, defendant argues that the Secretary of the Navy implemented regulations governing the Navy disability evaluation system, establishing "a PEB to act on his behalf in making determinations of fitness for duty . . . ."

SECNAVINST 1850.4E § 3301 (Apr. 30, 2002), in effect during plaintiff's separation proceedings, describes the standard used for disability determination:

The sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of office, grade, rank, or rating because of disease or injury incurred or aggravated while entitled to basic pay. Each case is considered by relating the nature and degree of physical disability of the member to the requirements and duties that member may reasonably be expected to perform in his or her office, grade, rank or rating.

SECNAVINST 1850.4E § 1004(a) (Apr. 30, 2002) provides that after the PEB has advised a servicemember of the PEB's preliminary findings "as to Fitness to continue naval service, degree of disability, and entitlement to disability pay," the servicemember may:

(2) Disagree with a records-only finding of Fit to continue naval service (or Physically Qualified for continued service in the Naval/Marine Corps Reserves in the case of inactive-duty reservists) and request reconsideration. For the case to be reconsidered, the member must provide medical or non-medical information not previously available or considered. The member also must state whether or not a hearing is desired if the finding of Fit or Physically Qualified for continued naval service is

unchanged. If the finding of Fit or Physically Qualified for continued naval service is confirmed, there is no right to a hearing.  Service members found Fit or Physically Qualified for continued naval service will be referred by the PEB to their service headquarters for appropriate assignment or disposition. TDRL [Temporary Disability Retired List] personnel found Fit to continue naval service will be given the option either of returning to active duty, being discharged from the naval service, or demanding a Formal PEB. The DIRNCPB [Director, Naval Council of Personnel Boards] is authorized to grant a request for a hearing in the case of a member found of Fit or Physically Qualified for continued naval service in order to preclude an error or injustice.

(a) Within a finding of Fit to continue naval service is the understanding that the mere presence of a diagnosis is not synonymous with a disability. In order to find that a member is Unfit for continued naval service, it must be established that the medical disease or condition underlying the diagnosis actually interferes significantly with the member's ability to carry out the duties of his or her office, grade, rank or rating.

(b) The PEB does not determine a member's status for deployability or suitability; therefore, a PEB determination of Fit to continue naval service does not preclude subsequent non-PEB determinations of temporary unfitness for specific assignments, PRT/PFT participation, disqualification from special duties, or administrative action (including separation) resulting from such determinations.

SECNAVINST 1850.4E § 1004(c)(2);  see also Russell v. United States, 102 Fed. Cl. 9, 14 (2011) ("A PEB determination that a member is fit to continue naval service is not equivalent to a determination that a member is fit for full duty, because the inability to perform duties in every geographic location 'will not be the sole basis for a finding of Unfit.' SECNAVINST 1850.4E."); SECNAVINST 1850.4E § 3307a ("Deployability.  Inability to perform the duties of his or her office, grade, rank, or rating in every geographic location and under every conceivable circumstance will not be the sole basis for a finding of Unfitness.").

As explained in SECNAVINST 1850.4E § 1004(c)(2)(b), the PEB's determination of fitness does not preclude a subsequent rating as "unsuitable" for other reasons, including, as in plaintiff's case, for "sea/sub/overseas" duty. At the time of plaintiff's separation proceedings, the Secretary of the Navy was specifically authorized, by the 1993 DOD Directive 1332.14, ¶ E3.A1.1.3.4.8.1, to issue administrative "separation [regulations] on the basis of other designated physical and mental conditions, not amounting to Disability . . . that potentially interfered with assignment to or performance of duty." See Strickland v. United States, 69 Fed. Cl. 684, 702-09 (2006); see also Favreau v. United States, 317 F.3d 1346, 1350 (Fed. Cir. 2002) ("When a service member is separated for failing these or any other standards, a reason for the separation is assigned pursuant to directives of the Secretary of Defense. DoD Directive 1332.14 ¶ E.2 (Dec. 21, 1993). This Directive sets out guidelines for the separation of service-members

and establishes certain grounds for discharge, although the services in their individual regulations may create additional reasons.")[29]

Regarding plaintiff's claim to have the right to a hearing before the PEB, the court notes that under Navy regulations, there is no right to a hearing after the reconsideration of a member's case by the PEB. Rather, granting a member a hearing, "if the finding of Fit . . . for continued naval service is unchanged," is fully within the discretion of the PEB. Specifically, "[i]f the finding of Fit . . . for continued naval service is confirmed, there is no right to a hearing." SECNAVINST 1850.4E § 1004(c)(2) (Apr. 30, 2002). Additionally, it was within the authority of the PEB to decline plaintiff's request for a hearing on the issue of plaintiff's fitness determination.[30] Moreover, plaintiff himself accepted that granting a hearing after the reconsideration of his case remains within the PEB discretion, by

---

[29] The 1993 DOD Directive 1332.14 subsequently, and well after Mr. Stein's separation occurred, was modified with the effect of preventing administrative separation based on unsuitability because of medical condition if the PEB found member fit for duty. Specifically, the newly added provision states:

> However, the Secretary concerned may not authorize involuntary administrative separation based on a determination that the member is unsuitable for deployment or worldwide assignment because of a medical condition if a Physical Evaluation Board has determined the member to be fit for duty for the same medical condition, unless the administrative separation is approved by the Secretary of Defense.

DODI 1332.14 ¶ E3.3.a(8)(a) (Aug. 28, 2008). Thus, it appears if plaintiff were separated today, plaintiff's administrative separation likely would require approval by the Secretary of the Navy, given the DOD Instruction currently in effect. The 2008 modification of the DODI 1332.14 was designed to address situations in which a servicemember was found fit for duty by the PEB, but was separated without Secretarial approval, based on a finding that an individual was "unsuitable for deployment or worldwide assignment," based on the same medical condition. In early 2004, at the time of plaintiff's separation, however, the Department of Defense Instruction 1332.14 authorized an administrative separation for the medical conditions which the PEB found unsuitable for all assignments, despite the finding of being fit. The parties agree that Mr. Stein did not petition to the Secretary of the Navy to retroactively apply DODI 1332.14 (Aug. 28, 2008) to his case.

[30] On February 18, 2004, the informal PEB reconsidered its initial finding of fit, but decided that there was no change to its initial findings. The PEB concluded:

> Other than the tic problem – suspected to be somatic – he is not disabled –
> + the tic isn't even disabling.

> FIT. No change. <u>No</u> formal board necessary.

> (capitalization and emphasis in original).

acknowledging the receipt of the informal PEB findings of fit and placing his initial next to the following statement: "If there is no change to the Preliminary Finding based upon the reconsideration, I request a Formal PEB. I understand this request is a privilege, not a right, and may not be granted."  Plaintiff was not separated for a disability, and, therefore, he was not entitled to a formal PEB pursuant to 10 U.S.C. § 1214.  Moreover, under the regulations in effect at the time of plaintiff's separation, the Navy was not required to provide a plaintiff a hearing.[31]

For the first time, in Mr. Stein's reply brief in support of his motion for judgment on the administrative record, plaintiff asserts that the court has jurisdiction to review his claims for back pay after April 14, 2004, when his enlistment period ended, based on 10 U.S.C. § 1552. Section 1552 of Title 10 authorizes the Secretary of a military department to correct military records when the Secretary considers it necessary to correct an error or remove an injustice. See 10 U.S.C. § 1552. Section 1552, however, the request to correct military records does not equate to a "'money-mandating'" statute which provides the basis for a jurisdiction of this court. See Martinez v. United States, 333 F.3d at 1315 (internal quotations omitted).  As the Federal Circuit explained in Martinez, "even though section 1552 mandates the payment of money if the correction board concludes that the service member's discharge was unlawful, section 1552 is not the 'money-mandating' statute that gives rise to the cause of action that provides the basis for a Tucker Act suit in the Court of Federal Claims." Id.; see also Miller v. United States, 119 Fed. Cl. at 728 ("The third count in the complaint relies upon the statute providing for the correction of military records, 10 U.S.C. § 1552 (2012). It is well-established that this statute is not money-mandating so as to support jurisdiction for suits brought before this court. See, e.g., Lewis v. United States, 458 F.3d 1372, 1376 n.3 (Fed. Cir. 2006) (citing Martinez v. United States, 333 F.3d 1295, 1315 (2003) (en banc))." (internal citation omitted).  In Bonewell v. United States, this court explained:

---

[31] The BCNR informed plaintiff that "[y]ou did not have the right to a hearing before the PEB because you were found fit for duty."  As noted above, SECNAVINST 1850.4E § 1004(c)(2) (Apr. 30, 2002) states: "If the finding of Fit . . . for continued naval service is confirmed, there is no right to a hearing."  In addition, DOD Directive 1332.14, Enlisted Administrative Separations, ¶ E3.A1.1.3.4.8.1. (Dec. 21, 1993), as well as the Secretary of the Navy Instruction 1850.4E, Department of the Navy Disability Evaluation System, ¶ 8001.a.(2) (Apr. 30, 2002), as "expressly permitting the discharge of an individual for medical conditions that do not amount to an unfitting disability." See also O'Brien v. United States, 120 Fed. Cl. 85, 91 (2015).  Mr. Stein was found fit, and, therefore, no right to a PEB was mandated.

The BCNR found that the symptoms of plaintiff's conditions "were minimal, and there is no indication in your record that you were unable to perform your duties, other than being excused from participation in the physical fitness assessment (PFA)."  The BCNR determination is supported by the MEB, which found that plaintiff's sleep apnea and his treatment with CPAC "should not interfere with [plaintiff's] ability to perform his duties on ship or on shore," and that "[t]he patient [was] fit for duty from a GI standpoint."  Consequently, plaintiff would not be able to show that the BCNR acted arbitrarily or capriciously in denying him a right to a PEB hearing.

In <u>Murphy</u>, the Federal Circuit noted:

> [N]otwithstanding the language of 10 U.S.C. § 1552(a), invocation of the rubric "injustice" provides no basis for judicial relief. There must be a "pure legal error." Section 1552(a) describes the Correction Boards' jurisdiction to act on behalf of the Secretary to "remove an injustice." It says absolutely nothing about the Claims Court's jurisdiction which is circumscribed solely by the Tucker Act, and which demands that the government be called upon to answer in money. Absent that, there is no review in the Claims Court of alleged "injustice."
>
> [<u>Murphy v. United States</u>,] 993 F.2d at 874 (emphasis added) (footnote and citations omitted).
>
> In other words, the Court of Federal Claims may review a failure to remove a purported injustice so long as the removal of the injustice would require the payment of money.

<u>Bonewell v. United States</u>, 111 Fed. Cl. 129, 143 (2013).

In <u>Martinez</u>, the Federal Circuit identified two exceptions to the rule that 10 U.S.C. § 1552 is not money-mandating: 1) "if the plaintiff should have been retired for disability but the Correction Board illegally failed to so find;" or, 2) "when the correction board has granted relief and the service member seeks to enforce or challenge the implementation or scope of remedial order." <u>Martinez v. United States</u>, 333 F.3d at 1314 n.4 (internal citations omitted). In the current case, 10 U.S.C. § 1552 could provide jurisdiction for this court only if the BCNR had determined that plaintiff's records should have been corrected or if Mr. Stein should have been retired for disability, but the BCNR "illegally failed to so find."

The March 19, 2012 BCNR decision stated:

> The version of MILPERSMAN article 1910-120, that was in effect in early 2004 was ill-considered and not well-written. Its purpose was to provide a means of separating service member who although not disabled, i. e., unfit for duty for reason of physical disability, were not operationally suitable or world-wide assignable because of one or more of the conditions listed in that article or specified by proper authority. If the words "in any capacity" are applied literally, MILPERSMAN article 1910-120 is vitiated, because none of the listed or likely to be specified conditions would prevent service members from completing their service "in any capacity."
>
> If the Court determines that the provisions of MILPERSMAN article 1910-120, paragraph 2c, are applicable to your case, and that being unable to complete your obligated service "in any capacity" was a prerequisite to your separation under the provisions of MILPERSMAN article 1910-120, the

Board would have to conclude that your separation was not in accordance with those provisions, as you were capable of performing duty ashore in a non-operational setting, and your did so for more than three years after you were initially found to be operationally unsuitable in 2001.  In that case, it would be appropriate to correct your record to show that you were discharged by reason of Secretarial authority or expiration of active obligated service (EAOS).

Therefore, the BCNR did not determine plaintiff's record should be corrected.  The BCNR reserved the issue of applicability of MILPERSMAN 1910-120 in plaintiff's case to the United States Court of Federal Claims, and, therefore, did not grant any relief for the time period between plaintiff's separation and expiration of his enlistment. Further, plaintiff has not demonstrated that the BCNR illegally failed to find plaintiff should have been retired for disability. Since neither of the two exceptions described in Martinez apply to plaintiff's back pay claims past April 14, 2004, plaintiff cannot rely upon 10 U.S.C. § 1552 as a basis for this court's jurisdiction. See Martinez v. United States, 333 F.3d at 1314 n.4 In sum, plaintiff's right to statutory compensation under 37 U.S.C § 204 ceased at the expiration of his term of enlistment, April 14, 2004, and plaintiff has failed to state a claim giving him right to back pay and allowances beyond that day.

**Enlisted Retainer Pay**

In his complaint, plaintiff also alleges that "[a]s a result of the wrongful discharge . . . the Navy denied him the right to retainer pay under 10 U.S.C. § 6330 that he would have been eligible to receive upon completion of 20 years of active service." Plaintiff claims that his "theory of entitlement to retainer pay turns on his argument that 10 U.S.C. § 1214 gives him a right to be credited with years of back pay and service," which should be counted from the time of his discharge on March 19, 2004, until the moment he is afforded a formal PEB hearing.  Plaintiff adds: "If this is true, then at this point, Mr. Stein would be at more than 20 years of service and would qualify for retainer pay." Defendant responds that plaintiff has failed to allege an appropriate statute, regulation or other authority giving him the right to enlisted, retainer pay, and defendant asserts that no such right exists. Defendant also argues that plaintiff did not allege that he served twenty years on active duty, thus, plaintiff has no right to enlisted retainer pay under 10 U.S.C. § 6330, indicating that "Mr. Stein cannot claim that he is entitled to any future military pay in order to achieve twenty years of active military service."

Plaintiff's request appears to be referring to the constructive service doctrine, based on which "'military personnel who were illegally or improperly separated from service are deemed to have continued in active service until their legal separation.'" Barnick v. United States, 591 F.3d 1372, 1379 (Fed. Cir. 2010) (quoting Christian v. United States, 337 F.3d 1338, 1347 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2003), cert. denied, 541 U.S. 972 (2004)). "They are, therefore, entitled to back pay and benefits for the intervening period, i.e., retroactive to their original separation from service." Christian v. United States, 337 F.3d at 1347 (citation omitted). "[T]he constructive service doctrine is a 'legal fiction,'" and attempts to "return successful plaintiffs to the position they

would have occupied 'but for' their illegal release from duty." Barnick v. United States, 591 F.3d at 1379 (quoting Dilley v. Alexander, 627 F.2d 407, 413 (D.C. Cir. 1980)).

In general, a servicemember is entitled to active duty pay only for the period that he or she is actually on active duty. See Barnick v. United States, 591 F.3d at 1379 (citing Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999)); see also Arroyo v. United States, 116 Fed. Cl. 691, 698 (2014); Peterson v. United States, 104 Fed. Cl. at 206. In Barnick, the Federal Circuit held that the constructive service doctrine was inapplicable to Barnick, "a reservist who had only been on temporary duty assignments never longer than thirty days, and [who] was on inactive status at the time of the improper action." Barnick v. United States, 591 F.3d at 1379-80. The Federal Circuit held, therefore, that for the constructive service doctrine to apply, a plaintiff must allege that he or she would have remained in the military on active duty but for some wrongful act by the government. Barnick v. United States, 591 F.3d at 1379; see also Wollman v. United States, 108 Fed. Cl. 656, 674-75 (2013). The Barnick court also held that the doctrine did not apply in cases in which a former servicemember claims that "he should have been retained on active duty merely for disability evaluation . . . ." Barnick v. United States, 591 F.3d at 1379-80; see also Wollman v. United States, 108 Fed. Cl. at 674.

Mr. Stein's complaint alleges that his conditions warrant a disability determination, and is seeking retention in the Navy for the purpose of receiving a formal PEB hearing, contesting the prior determinations of fit issued on January 13, 2004 and February 18, 2004. As recently noted by a Judge of the United States Court of Federal Claims, "[s]uch a request is foreclosed by Barnick." Peterson v. United States, 104 Fed. Cl. at 207; see also Wollman v. United States, 108 Fed. Cl. at 675 ("[T]he plaintiff fails to allege that he could remain on active duty after receipt of a proper disability evaluation, he cannot maintain a claim for back pay under 37 U.S.C. § 204 and this court may not grant his ancillary request to be restored to active duty."). As determined above, Mr. Stein would only have been able to be retained in the military until the end of expiration of his enlistment on April 14, 2004. Moreover, it appears that plaintiff believes that he was disabled at the time of his discharge on March 19, 2004, having applied to the VA for a disability rating and because he seeks an 80% disability rating, as well as attempts to get a formal PEB hearing in order to have the formal PEB acknowledge his duty status as unfit.[32] Plaintiff has not demonstrated that he was improperly separated from the service,

---

[32] The court notes that at the time of plaintiff's MEB and PEB evaluations, the Navy and the VA employed different rating standards for assessing medical disability and to determine whether a veteran qualifies for disability status and compensation. See Cole v. United States, 32 Fed. Cl. 797, 802 (1995) ("In contrast to the issue of fitness, the VA rating schedule is not based on the impact of a disability on military service. Rather, the schedule rates the effect of the disability on civilian employment. Therefore, it is possible for a person who is unfit for military service to be zero percent disabled under the VA rating schedule." (citations omitted)); see also Joslyn v. United States, 110 Fed. Cl. at 395-96; Stine v. United States, 92 Fed. Cl. 776, 795 (2010) (quoting Slesinski v. United States, 34 Fed. Cl. 159, 164 (1995)) ("'An award of a higher VA rating does not establish error or injustice in the [Navy] rating.'"), aff'd, 417 F. App'x 979 (Fed. Cir.), cert. denied, 132 S. Ct. 522 (2011); Hinkle v. United States, 229 Ct. Cl. 801, 804-05 (1982) ("The

nor can he demonstrate that the constructive service doctrine applies to his case. Therefore, Mr. Stein cannot demonstrate entitlement to enlisted retainer pay.

### Plaintiff's Challenge to the Merits of the PEB's Finding of Fit

Plaintiff also challenges the determination by the PEB that Mr. Stein was found fit. Plaintiff notes, "[a]s he argued before the BCNR, 'The facts and their application to the regulations show that Mr. Stein, despite being found fit by the PEB, was treated by the Navy as being unfit. It was his unfitness that resulted in his separation from the Navy. This was in violation of law and regulations.'" In a seemingly contradictory position to plaintiff's claim that he should be allowed a disability retirement, plaintiff argues, "[w]hen the PEB found the Petitioner fit, this was binding on the Navy. The subsequent separation of the Petitioner under MILPERSMAN 1910-120 was contrary to law and regulation."

Citing Adkins v. United States, 68 F.3d 1317, 1323 (Fed. Cir. 1995), defendant argues that "the merits of a decision committed wholly to the discretion of the military are not subject to judicial review," and, a determination of fitness, addressing "the basic question of an individual's eligibility to serve the nation as a war fighter," presents such an issue. Defendant argues that only "'a challenge to a particular procedure followed by the military in rendering a decision may present a justiciable issue.'" (quoting Robinson v. United States, No. 10-397C, 2011 WL 4437715, at *3 (Fed. Cl. Sept. 23, 2011), aff'd, 491 F. App'x 195 (Fed. Cir. 2013)) (internal citation omitted).

Defendant also cites to Blankenship v. United States, 84 Fed. Cl. 479, 487 (2008), in which the Court of Federal Claims declined to reinstate a former officer to the Aviation Training Program, or state that the BCNR's decision denying his application for correction of his military records to reflect award of his wings as a Naval Aviator, was arbitrary or capricious, as nonjusticiable issue. The court held: "It is the Navy, not the court, that is the crucial decisionmaker with respect to plaintiff's qualifications to receive his aviator wings.  The military must determine who is and is not fit to serve as a naval pilot." Blankenship v. United States, 84 Fed. Cl. at 487 (internal citation omitted). Although plaintiff argues that the facts in Blankenship are distinguishable from plaintiff's case,

_____

Veterans Administration does not determine fitness for military duty, which is the responsibility of the Secretary and military authorities."). Indeed, in the case before the court, the December 20, 2010 BCNR decision acknowledged the differences between the Navy and the VA ratings:

> You [plaintiff] contend that since the VA awarded you a combined disability rating of 80 percent, the Department of the Navy erred when it found you fit for duty. The Board disagrees. It noted that the VA assigned disability ratings to each of your conditions it determined had been incurred in the line of duty.  The VA assigned those ratings based on those conditions and without regard to the issue of your fitness to perform military duty as of the date of your separation from the service.

because the <u>Blankenship</u> plaintiff "was seeking to challenge the finding of unfitness," while he "is challenging both his denial of a requested Formal Physical Evaluation Board ('FBEB') and the Navy's failure to give effect to its finding of fitness," plaintiff's argument is unavailing.  Both the <u>Blankenship</u> case and Mr. Stein's case concern the military's exercise of discretion on personnel matters. Additionally, both concern determinations of who is fit to serve in particular assignment in the Navy.  <u>See Voge v. United States</u>, 844 F.2d at 779-80; <u>see also Fisher v. United States</u>, 402 F.3d 1167, 1176 (Fed. Cir. 2005); <u>Lindsay v. United States</u>, 295 F.3d 1252, 1257-58 (Fed. Cir. 2002) (quoting <u>Voge v. United States</u>, 844 F.2d at 780); <u>O'Brien v. United States</u>, 120 Fed. Cl. at 93 ("'Fit' and 'Unfit' are terms of art within the DES [Navy Disability Evaluation System] and the court will not substitute its judgment for that of either the military review board or the decisions made by qualified medical evaluators.").

Defendant also argues that "Mr. Stein challenges the substance of the PEB's determination, his claim is nonjusticiable, and he simply asks this Court to substitute its judgment for that of the PEB. This, however, the Court cannot do. Therefore, the Court should dismiss Mr. Stein's challenge to the merits of the PEB's finding that he was fit to continue on active duty."

It is well settled that the task of running the military should be left to the expertise and discretion of the military.  <u>See</u>, <u>e.g.</u>, <u>Orloff v. Willoughby</u>, 345 U.S. at 93 ("[J]udges are not given the task of running the Army").  Accordingly, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." <u>Dep't of Navy v. Egan</u>, 484 U.S. 518, 530 (1988).  Judicial deference must be "at its apogee" in matters pertaining to the military and national defense.  <u>See Voge v. United States</u>, 844 F.2d at 779 (citing <u>Rostker v. Goldberg</u>, 453 U.S. 57, 70 (1981)).

The Federal Circuit has indicated that "[j]usticiability is a particularly apt inquiry when one seeks review of military activities." <u>Murphy v. United States</u>, 993 F.2d 871, 872 (Fed. Cir.), <u>reh'g denied</u> <u>and</u> <u>en banc suggestion declined</u> (Fed. Cir. 1993), <u>cert. denied</u>, 511 U.S. 1019, <u>reh'g denied</u>, 511 U.S. 1118, (1994) (citation omitted). As noted in <u>Miller v. United States</u>, "[e]ven if a military pay controversy is within this court's jurisdiction, it may not be justiciable—there may be no relief that the court can devise without intruding into the military's particular sphere of responsibility." <u>Miller v. United States</u>, 119 Fed. Cl. at 725 (citing <u>Murphy v. United States</u>, 993 F.2d at 872).  The Federal Circuit has indicated that "there are 'thousands of . . . routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with.'" <u>Antonellis v. United States</u>, 723 F.3d at 1332 (quoting <u>Voge v. United States</u>, 844 F.2d at 780).

In <u>Heisig v. United States</u>, 719 F.2d 1153 (Fed. Cir. 1983) the Federal Circuit specifically addressed determinations of findings of fit  and stated: "It is equally settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same

evidence." Id. at 1156 (footnotes omitted); see also O'Brien v. United States, 120 Fed. Cl. at 93; Johnson v. United States, 93 Fed. Cl. 666, 675 (2010), aff'd, 467 F. App'x 883 (Fed. Cir.), reh'g denied (Fed. Cir. 2012); Gossage v. United States, 91 Fed. Cl. 101, 107, aff'd, 394 F. App'x 695 (Fed. Cir. 2010). Recently, a Judge of the Court of Federal Claims wrote, "[p]laintiff's remaining arguments amount to a request that the court decide the merits of Plaintiff's fitness for duty. As it must, the court declines to do so." Meidl v. United States, 114 Fed. Cl. 607, 618-19 (2014) (citing Heisig v. United States, 719 F.2d at 1156).[33] The same is true in the above captioned case, plaintiff's challenge to the PEB's determination of fit is nonjusticiable.

**Right to Promotion**

Plaintiff's alleged right to promotion was not asserted in the complaint he filed in this court. Plaintiff first asserted this claim to the BCNR, while on remand from this court, in a "Memorandum in Support of Application for Correction of Military Records." In the Memorandum, plaintiff "request[ed] that his records be changed to reflect that he was retired for length of service with an in-service promotion of one or more enlisted grades," claiming that had "the Petitioner continued his career, he would have been promoted one or more times." Defendant argues, because as determined above, plaintiff had no right to reenlist, plaintiff's claim for a promotion cannot succeed.  Defendant also argues that

---

[33] In his motion for judgment on the administrative record plaintiff asserted that the BCNR incorrectly based its decision on Mr. Stein's weight, although, according to plaintiff, he "was never out of compliance with Navy weight regulations." Plaintiff claims that "[t]he BCNR's decision, to the extent that it relied on his weight as a factor, was arbitrary, capricious, and contrary to law." As noted recently by a Judge of the Court of Federal Claims "a fit for duty determination is supported by substantial evidence so long as relevant evidence exists 'that a reasonable mind might accept as adequate to support a conclusion.' A fit for duty determination may be found arbitrary and capricious if evidence was ignored or unreasonably construed or if the evaluating board neglected to perform its designated duties." Joslyn v. United States, 110 Fed. Cl. at 392 (citations omitted).

In plaintiff's case, the March 19, 2012 BCNR's decision made several references to plaintiff's weight, including noting that plaintiff "gained more than 100 pounds during [his] career in the Navy," and that physicians evaluating plaintiff's condition "were clearly concerned about [his] weight." The BCNR, however, made clear that it 'would have denied [Plaintiff's] application irrespective of [his] weight," and as determined above, there were a variety of other reasons for which the BCNR was fully within its authority to deny plaintiff's application for correction of records. As explained on multiple occasions by the MEB and PEB, plaintiff's conditions were found not sufficient to classify plaintiff as disabled.  Rather he was found fit to serve, albeit not in all capacities.  Moreover, plaintiff was not entitled to a formal PEB hearing as he was not separated on the basis of established disabilities.  As determined above, plaintiff also did not have a right to re-enlist or remain in the Navy after the expiration date of his last enlistment.

"even if he were entitled to reenlist, Mr. Stein fails to identify any statute, regulation, or other authority entitling him to a promotion as a matter of law, and none exists."[34]

Generally, plaintiff's failure to raise a claim in the complaint constitutes a waiver of that issue in the future litigation. See Casa de Cambio Comdiv. S.A. de C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 921 (2003) (holding that a claim not raised in the plaintiff's complaint was waived); see also Corus Staal BV v. United States, 502 F.3d 1370, 1378 n.4 (Fed. Cir. 2007) (holding that argument not raised in plaintiff's opening brief was waived); Kalick v. United States, 561 n.10, aff'd, 541 F. App'x 1000 (Fed. Cir. 2013) (holding that claims raised for the first time in plaintiff's response were waived).  Plaintiff cites at length Haskins v. United States, 51 Fed. Cl. 818, 822-823 (2002), arguing that this court has broad powers to grant relief incidental and collateral to a money judgment under 10 U.S.C. § 1201, regardless of the original claims asserted in a complaint.  Mr. Stein notes that although the plaintiff in Haskins challenged his disability findings, he did not request a specific retirement status, and the Haskins court, nevertheless, concluded that it had the authority to award such a relief. According to Mr. Stein, therefore, this court can now "properly consider plaintiff's claim regarding his right to promotion despite it not being raised in the complaint."

Regardless, the court lacks the authority to promote plaintiff. As recently explained by a Judge of this court, "[i]t is well-settled that the promotion of military officers is not a power granted this court."  Miller v. United States, 119 Fed. Cl. at 730. The Federal Circuit has indicated that

> in the promotions context we have noted that "the Military Pay Act ordinarily does not give rise to a right to the pay of the higher rank for which the plaintiff was not selected." Smith v. Sec'y of the Army, 384 F.3d 1288, 1294 (Fed. Cir. 2004). This is so because, generally, "a service member is entitled only to the salary of the rank to which he is appointed and in which he serve[d]."

---

[34] Plaintiff cited one case in support in his reply brief, Neal v. Secretary of Navy & Commandant of Marine Corps, 639 F. 2d 1029 (3d Cir. 1981), which plaintiff claims "specifically dealt with BCNR failure to address the injustice in the denial of a promotion." The United States Court of Appeals for the Third Circuit in Neal undertook the review of procedural irregularities surrounding rejection of plaintiff's reenlistment and promotion, based on 10 U.S.C. § 1552.  See Neal v. Sec'y of Navy & Commandant of Marine Corps at 1042-44. Neal and the current case, however, are factually different. Unlike the servicemember in Neal, Mr. Stein did not attempt to reenlist in the Navy, nor did he seek the approval of the Secretary of the Navy to take action to set aside his bar to reenlist. Moreover, while plaintiff in Neal did not know the extent of the charges brought against him, was not permitted to see the relevant records to his case, was not allowed to comment, nor have his counsel involved in the administrative review of his case, Mr. Stein was afforded an opportunity to fully present his claims, including to the BCNR on two separate occasions and was represented by counsel during the BCNR's review process. The procedural safeguards required during the BCNR's review, lacking in Neal, were properly followed in Mr. Stein's case.

Id. However, we have also recognized circumstances in which back pay is available. One such exception arises when the plaintiff "has satisfied all the legal requirements for promotion, but the military has refused to recognize his status." Id. (citing Skinner, 594 F.2d at 830). Another exception arises when a decision not to select a plaintiff for promotion leads to his compulsory discharge. See id. at 1295. In such circumstances, a successful plaintiff may recover back pay because the Military Pay Act "'confers on an officer the right to pay of the rank he was appointed to up until he is properly separated from the service.'" Id. (quoting Sanders, 594 F.2d at 810).

Antonellis v. United States, 723 F.3d at 1333.

The Federal Circuit recognized two, specific exceptions to the rule that this court lacks authority to promote servicemembers, first, if "an individual has a 'clear cut legal entitlement' to a position, but subordinate officials in the government misinterpret the Constitution, statutes, or regulations, and improperly decline to recommend that individual for nomination or appointment, redress may be available in the courts." Lewis v. United States, 458 F.3d 1372, 1377, reh'g en banc denied (Fed. Cir. 2006), cert. denied, 552 U.S. 810 (2007) (quoting Smith v. Sec'y of the Army, 384 F.3d at 1294-94); see also Dysart v. United States, 369 F.3d 1303, 1313 (Fed. Cir. 2004) (requiring a clear legal right to a promotion to successfully assert a denial of promotion claim); Skinner v. United States, 219 Ct. Cl. 322, 332, 594 F.2d 824, 832 (1979) (holding that plaintiff has the burden of showing a "clear-cut, legal entitlement" to the promotion); Doggett v. United States, 207 Ct. Cl. 478, 482 (1975) ("We have repeatedly refused to interject ourselves into the discretionary military promotion process even if legal error was in some respect committed as to the complaining serviceman. While normally we will not award a person pay above the pay of the position he actually occupies we do so if he shows a clearcut legal entitlement to the pay of a higher grade.") (citations omitted); Miller v. United States, 119 Fed. Cl. at 730; Brooks v. United States, 88 Fed. Cl. 141, 151 (2009) ("The Federal Circuit in Law held that while our Court lacks the authority to *grant* a promotion, we may 'recognize that it had occurred' as a matter of law." (quoting Law v. United States, 11 F.3d 1061, 1065 (Fed. Cir. 1993)) (emphasis in original). Mr. Stein has failed to prove, however, that he had a "clearcut legal entitlement" to promotion. Furthermore, the administrative record lacks any indication that plaintiff was selected for promotion. Mr. Stein's general statement to the BCNR that had he "continued his career, he would have been promoted one or more times," is insufficient.

The second exception, although not relevant to plaintiff's case, is that the court can consider a service member's promotion claim under the following conditions:

[W]hen the decision not to promote the service member leads to the service member's compelled discharge. If, in such a case, the effect of an order voiding the nonpromotion decision would be to give the service member a right to continue in the service at his previous rank, he would have a claim for the pay lost because of his improper separation. In that instance, the Military Pay Act would give the service member a right to back pay, because

the Act "confers on an officer the right to pay of the rank he was appointed to up until he is properly separated from the service."

Smith v. Sec'y of the Army, 384 F.3d at 1294-95 (quoting Sanders v. United States, 219 Ct. Cl. 285, 594 F.2d at 810).  As noted above, this exception does not apply to plaintiff, and, therefore, neither exception to the rule that this court lacks the authority to promote servicemembers applies

The BCNR twice determined the BCNR does not promote service members who have not been selected for promotion. As indicated in the December 20, 2010 decision, "[as] a matter of policy, the Board does not promote Sailors or Marines who have not been selected for promotion by their respective services." In the December 20, 2010 decision, the BCNR concluded that plaintiff has "not demonstrated that [he] would have been selected for promotion if [he] had remained on active duty," and, "[a]s a matter of policy, the Board does not promote Sailors or Marines who have not been selected by their respective services." The BCNR explained that plaintiff "served as a frocked ET1"[35] and was "never actually advanced to ET1, or qualified for advancement for that pay grade on or after 26 January 1996." The BCNR also noted that plaintiff's "service in pay grade E-6 was average at best," as he was "often rated below the center of mass [his] peers."  Nor has plaintiff demonstrated that he fits either exception to the rule that the Military Pay Act does not give the right to promotion.

Plaintiff contends the December 20, 2010 BCNR decision denying his request, including the statement that he was "'never actually advanced to ET1,'" is incorrect, because, according to plaintiff, he "served in that grade, his military records reflect that he held that grade, and his superiors and military officials treated him as holding that grade." In the second remand to the BCNR, plaintiff argued that the first BCNR decision improperly relied on plaintiff's old performance records, originating almost ten years before his separation. Plaintiff claims that "his more recent evaluations show a superior Sailor" and "warrants advancement."

The court agrees with the BCNR that being frocked to a certain pay grade does not change the permanent status of a servicemember. While the servicemember may assume the title and wear the uniform of the frocked grade, he does not actually serve in that grade, and is not entitled to the pay and allowances of that grade. See MILPERSMAN 1420-060, ¶ 3. Moreover, despite plaintiff's contentions to the contrary, Mr. Stein signed the Administrative Remarks acknowledging his understanding of the frocked status, stating:

---

[35] MILPERSMAN 1420-060, Frocking of Enlisted Personnel, ¶ 1 (Nov. 8, 2005), provides: "Frocking is an administrative authorization to assume the title and wear the uniform of a higher paygrade without entitlement to the pay and allowances of that grade." MILPERSMAN 1420-060, ¶ 3 states that "[f]rocking does not change the permanent status of a member, or authorize payment of entitlements governed by statute or regulation."

I understand that the frocked paygrade is an administrative authorization to wear the uniform and insignia of a higher rate without entitlements of allowances of the frocked allowances of the frocked paygrade. I understand that the frocked paygrade is effected at my option and that no increased pay and allowances accrue to me and that any cost for additional uniforms or insignia incident to my being frocked will be defrayed by me, and that no retroactive pay, allowance, or reimbursements will be authorized. I volunteer to be frocked to the rate of ET1.

In sum, the court lacks jurisdiction over plaintiff's promotion claim and cannot award him that equitable relief.

### Reimbursement of Health Care Costs

Plaintiff's complaint further requests reimbursement "of all out of pocket expenses for medical care incurred since his removal from active duty." In his response to the motion to dismiss, plaintiff states, "should Mr. Stein be found to have been wrongfully discharged, then he would be entitled to TriCare health insurance coverage during his period of wrongful discharge and would be entitled to payment for his expenses." Plaintiff repeats these assertions in his reply brief, stating, "should Mr. Stein prevail in his claims, he and his family will be covered by military medical insurance. Therefore, as a consequence of relief that may be granted by this Court, he has stated a claim upon which relief may be granted. For this reason, the defendant's motion to dismiss should be denied." (internal citation omitted).

Defendant contends that "Mr. Stein has failed to state a claim for the payment of unreimbursed medical expenses that he may have incurred after the end of his term of enlistment for the same reasons he is not entitled to pay and allowances after the end of his enlistment term." According to defendant, to the extent plaintiff is claiming reimbursement of medical costs incurred during the 26 days between the separation and the end of his obligated service, such claim is not ripe because plaintiff has not presented any evidence of those expenses to the Navy or the BCNR. Defendant, therefore, claims that plaintiff's failure to address this argument indicates that plaintiff "has effectively conceded the issue." (citing Cardiosom, LLC v. United States, 91 Fed. Cl. 659, 664 (2010), rev'd on other grounds, 656 F.3d 1322 (Fed. Cir. 2011).

The court agrees, as the administrative record does not evidence any documentation of medical costs by plaintiff. As reflected in Barnick v. United States, before a claim for medical expenses can be considered to be ripe, the claim must have been denied by the military. See Barnick v. United States, 591 F.3d at 1382.[36] The court

---

[36] As explained by the Federal Circuit:

Finally, Barnick asserts that he continues to be denied medical reimbursement following the correction of his LOD determination, and that the Board's failure to enforce those payments was arbitrary, capricious, and

fails to find a support for plaintiff's healthcare cost claim. Plaintiff's claim for reimbursement must fail for insufficiently stating a claim upon which relief can be granted. Plaintiff has failed to demonstrate that he was wrongfully discharged and has presented no evidence to support any claims for medical reimbursement following his discharge.

## CONCLUSION

The court, therefore, finds that plaintiff failed to state a claim upon which relief can be granted with respect to his alleged right to back pay and allowances beyond the expiration of his enlistment on April 14, 2004, his enlisted retainer pay, his claim of entitlement to promotion, and his claim regarding unreimbursed medical expenses. In addition, the court finds nonjusticiable the PEB finding of fit. As conceded by the government, plaintiff is entitled to back pay and allowances for the 26 days between his wrongful discharge on March 19, 2004 and the expiration of his enlistment on April 14, 2004. With respect to all other plaintiff's claims, defendant's motion to dismiss is **GRANTED**. The court awards plaintiff back pay and allowances for the 26 days from the date of his discharge on March 19, 2004, to April 14, 2004.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

contrary to law. The Court of Federal Claims rejected this claim apparently on the ground that Barnick had not yet submitted all of the required documentation to the Air Force so that his reimbursement could be processed. See Barnick, 80 Fed. Cl. at 551 n. 4. He did so shortly before the court issued its decision, but his request had not yet been acted on at the time of the decision. Thus, the Court of Federal Claims did not err in rejecting Barnick's medical reimbursement claim, as it did not mature until reimbursements were acted on unfavorably by the Air Force. That occurred while this appeal was pending. To the extent that Barnick disagrees with the Air Force's decision not to reimburse certain expenses, the trial court's decision does not preclude Barnick from filing another claim with the court.

Barnick v. United States, 591 F.3d at 1382.